**FIRST SECURITY BANK OF UTAH, N.A., Plaintiff,**

v.

**Dan FELGER and CS, Ltd., Defendants.**

**Civ. No. 86–C–0185W.**

United States District Court, D. Utah, C.D.

April 9, 1987.

Kent H. Murdock, Steven H. Gunn, Jeffrey D. Eisenberg, Salt Lake City, Utah, for plaintiff.

Robert S. Howell, Michael F. Jones, Jeffrey R. Orritt, Louise T. Knauer, Salt Lake City, Utah, for defendants and third-party plaintiffs.

Carman E. Kipp, Salt Lake City, Utah, for third-party defendant.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

This matter is before the court on both parties' Motions for Summary Judgment. The court heard oral argument on March 16, 1987. Plaintiff First Security Bank of Utah, N.A. ("FSB") was represented by Kent H. Murdock and Jeffrey D. Eisenberg. Defendants Dan Felger and CS, Ltd., were represented by Louise T. Knauer. Following oral argument the court took the matter under advisement. After considering the arguments of counsel, the memoranda and the relevant authority the court now renders the following decision and order.

### I. *Background*

In 1978 Keith E. Garner and others, ("the Garner group") not parties to this litigation, were developing a shopping center known as Carriage Square, South Bank ("the Property"). FSB loaned the Garner group $900,000.00 and the Garner group executed a Note ("Garner Note") for that sum payable to FSB. The Garner group also executed a Trust Deed ("Garner Trust Deed") in favor of FSB to secure payment of the Garner Note. Garner subsequently sold his interest in the Property to Carriage Square Investors, Ltd. In 1981, Dan Felger purchased a 50% share of Carriage Square Investor's interest in the Property. This joint venture between Carriage Square Investors and Felger was organized as Carriage Square, Utah. Dan Felger assumed the role of a general partner of Carriage Square, Utah and served as the managing partner of that entity at all times thereafter. Carriage Square, Utah never formally assumed liability on the Garner Note, but it made the payments to FSB on the Garner Note until approximately the summer of 1983. In the summer of 1983, the Garner Note went into default and FSB began foreclosure proceedings on the Property. In October 1983, Felger approached FSB and offered to bring the Property out of foreclosure if FSB would modify the payment terms of the Garner Note so that the arrearage could be brought current over an extended period of time. At this time Felger formed CS, Ltd., a California limited partnership with Dan Felger as its general partner. CS, Ltd. purchased the Property from Carriage Square, Utah in December 1983. Felger and CS, Ltd. hired the law firm of Cohne, Rappaport and Segal ("CR & S") to represent them in negotiating the terms of the loan proposal with FSB and to review loan documents submitted to Felger by FSB. Felger, CR & S and FSB conducted ongoing negotiations from October 1983 through January 1984 regarding CS, Ltd.'s proposal to bring the Property out of foreclosure. The parties eventually agreed to a proposal by which FSB agreed to make a new, second loan secured by a second trust deed on the Property to CS, Ltd. CS, Ltd. agreed to apply the proceeds of the loan to bring current the arrearages on the Property, including the past due payments on the Garner Note. CS, Ltd. did not assume liability under the Garner Note, which remained in force, but CS, Ltd. commenced

making the payments to FSB on the Garner Note. FSB prepared the Note, together with a second Trust Deed on the Property and other transmittal documents constituting the loan package. These documents were delivered by FSB on or about December 30, 1983 to Ray Beck of CR & S with a cover letter which read as follows:

First Security Bank of Utah, N.A. agrees to make the loan subject to the terms and conditions of the attached Trust Deed and Note.

The Note was drafted for signature as follows:

CS, Ltd.

A California Limited Partnership

By ————————————————

Dan Felger, General Partner

The Note contains no provision stating that Felger, though signing as a general partner, was not to be personally liable for the obligation or providing that the Note would be without recourse. The Note, Trust Deed and transmittal documents were sent by Ray Beck to Felger for Felger's signature on or shortly after December 30, 1983. On January 4, 1984 Felger called Beck and discussed revising the Note so that Felger would not be personally liable for payment. However, the Note was signed by Felger, and mailed to his attorney without any alterations on January 5, 1984. Beck then delivered the executed and unaltered Note, the Trust Deed (Felger had made an alteration to the Trust Deed deleting a paragraph concerning impoundment of funds for taxes and insurance) and the other loan documents to FSB. After receiving the loan documents from FSB, neither Felger nor anyone at CR & S discussed possible changes to the Note with FSB, nor did they discuss Felger's personal liability under the Note with FSB after that time. CS, Ltd. made the payments owing under the Garner Note and the CS, Ltd. Note to FSB from January 1984 until approximately February, 1985. In February, 1985, the Garner Note and the CS, Ltd. Note went into default. On or about February 26, 1985, Backman Title Company, as Trustee on the Garner Trust Deed, filed a notice of default under the Garner Trust Deed on the Prop-

erty with the Salt Lake County Recorder. No notice of default under the CS, Ltd. Note or Trust Deed was ever filed. FSB commenced a forclosure action against the signatories to the Garner Note and Garner Trust Deed. On May 28, 1985, Backman Title Company mailed a notice of sale to the parties with interests in the Property informing them that the property would be sold on June 25, 1985. Notice of sale was sent to CS, Ltd. at 4626 Van Nuys Boulevard, Suite 202, Sherman Oaks, California. The notice of sale was never delivered and was returned to the Trustee because CS, Ltd. had moved its offices. CS, Ltd. had informed FSB of its move prior to May 28, 1985, but never expressly requested that FSB send a copy of any notice of default or notice of sale to any address other than that specified in the Deed of Trust. Neither CS, Ltd. nor Dan Felger received a notice of sale of the property from the Trustee prior to the sale of the property. FSB never foreclosed on the Trust Deed which secured the CS, Ltd. Note. FSB purchased the Property at a Sheriff's Sale on June 25, 1985, by credit bidding the Garner Note in the amount of $925,127.52 in principal and interest at the sale. The total indebtedness on the property on the date of sale was $999,724.80. The fair market value of the property on June 25, 1985 is in dispute. Based on an appraisal which defendants obtained on February 10, 1987, the fair market value of the Property on June 25, 1985 was $1,000,000.00. Based on an appraisal which FSB obtained on June 19, 1985, the fair market value of the property as of that date was $785,000.00. This appraisal was reviewed by a second independent appraiser and affirmed on July 11, 1985. In September 1985, Colonial Funding, a California general partnership, purchased the property from FSB for $690,000.00.

## II. *Discussion*

### A. *FSB's Prima Facie Case*

Defendants do not contest that the Note was executed by CS, Ltd., by Dan Felger, General Partner and that no payments on the Note have been made by CS, Ltd. or Felger since November 1984. The Note on

its face contains nothing to indicate that Felger will not be personally liable, and in signing as a general partner, Felger is personally liable by operation of law for the obligation. UTAH CODE ANN. §§ 48–1–12 and 48–2–9.

■ Felger contends that he gave instructions to his counsel that the Note was not to be delivered to FSB unless changes were made to the Note deleting his personal liability. However, regardless of what transpired between Felger and his attorneys, Defendants cannot claim non-delivery of the Note. Defendants' attorneys delivered the Note to FSB without any changes. Thereafter, neither Felger nor his counsel discussed changing or altering the Note with anyone at FSB, nor did Felger or CR & S raise questions concerning the interpretation of the Note with FSB. Defendants hired CR & S as their attorneys and permitted CR & S to represent them in negotiating the loan, in reviewing the transaction and in transmitting the loan documents to FSB. Since any neglect by an attorney is attributable to his client under principles of agency, *Russell v. Martell*, 681 P.2d 1193, 1195 (Utah 1984), defendants cannot now claim non-delivery of the Note or claim that the delivery was a conditional one by asserting that their agents failed to carry out their instructions. *See, e.g., Crisp, Courtemanche Meador & Associates v. Medler*, 663 P.2d 388 (Okla.App.1983) (Undisclosed limitation privately agreed upon between attorney and client is not binding upon a third party who relies upon what is apparently within the attorney-agent's scope of authority), *Stricker v. Frauendienst*, 669 P.2d 520 (Wyo.1983) (same).

Having established the execution, delivery and non-payment of the Note, FSB has established its prima facie case of liability against both Felger and CS, Ltd. as a matter of law.

B. *Felger's Defenses*

■ Felger asserts that at some point during the negotiations leading up to the execution of the Note and Trust Deed, the parties agreed that Felger would not be personally liable for the Note. While this is disputed by Felger's own counsel, CR & S and by FSB, Felger's allegations, even if taken as true for this motion, do not raise a triable defense under the undisputed facts.

Felger merely contends that at some point during the negotiations which led to execution of the loan documents there was an understanding that he was not to be personally liable on the Note. Felger thereafter received the Note for signature, returned it to his attorneys in executed form and without any alterations, and Felger's attorneys then forwarded the executed Note to FSB without requesting changes to the Note.

1. *Parol Evidence Rule*

■ Felger has alleged an oral agreement which is inconsistent with the written loan documents which followed. The Supreme Court of Utah has recognized the parol evidence rule, which bars the introduction of such oral evidence:

> ... When the parties have reduced to writing what appears to be a complete and certain agreement, it will be conclusively presumed, in the absence of fraud, that the writing contains the whole of the agreement between the parties. Also, that parol evidence of contemporaneous conversations, representations or statements will not be received for the purpose of varying or adding to the terms of the written agreement.

*State Bank of Lehi v. Woolsey*, 565 P.2d 413, 418 (Utah 1977); *see also Hartman v. Potter*, 596 P.2d 653, 656 (Utah 1979).

In *Woolsey*, the defendant alleged that prior to executing a written assignment of her home to secure a loan, the Bank agreed that the assignment would be released upon the occurrence of an event in 1975. However, the assignment contained no reference to any such agreement and the court held that defendant's parol evidence was inadmissible. *Id.*

In the present case, just as in *Woolsey*, the allegations of a prior oral agreement between the parties are inadmissible, since the loan documents which follow are clear on their face.

#### 2. *Estoppel*

■ Felger argues that because FSB represented to him that he would not be liable on the Note, FSB is now estopped from seeking recovery against him. This argument is without merit. FSB clearly communicated to Felger's counsel that FSB was making the loan subject to the express written terms of the Note and Felger's counsel fully understood that Felger would be personally liable. Felger is bound by this knowledge. Nor can Felger credibly assert reliance on any statement to the contrary. When Felger transmitted the executed Note to his attorneys, he expressly instructed them:

> If you feel that the documents I have executed adequately protect my personal liability, you may forward them to the Bank as they are. *If not*, please add such language that will protect my personal liability.

This letter plainly reveals that Felger was relying on his own counsel, not FSB, to protect his interests. His estoppel claim therefore must fail as a matter of law.

#### C. *CS, Ltd. and Felger's Claims and Defenses*

#### 1. *Choice of Law*

■ Though Utah law is the law of this forum in diversity cases generally, *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938), this court is entitled to rely upon the forum's conflict of laws principles and its choice of law rules in adjudicating the actions that come before it. *See Mullinax Eng. Co. v. Platte Valley Const. Co.*, 412 F.2d 553, 555 (10th Cir.1969). The court is aware that in determining the force and effect of the provisions of a contract, Utah courts have applied the *lex loci contractus* rule and look to the law of the place of the making of the contract. *See Crofoot v. Thatcher*, 19 Utah 212, 57 P. 171 (1899); *Petrof Trading Co. v. Intermountain Research & Eng. Co.*, 424 F.2d 704, 706 (10th Cir.1970); *Trans-America Collections, Inc. v. Conti-* *nental Account Servicing House, Inc.*, 342 F.Supp. 1303, 1305 (D.Utah 1972); *Chevron Chemical Co. v. Mecham*, 536 F.Supp. 1036, 1040 (D.Utah 1982).[1] Defendants contend that because Felger executed the Note in California, that is where the contract was made and hence California law governs this case.

The rule of *lex loci contractus*, or the law of the place of contracting, was adopted by the first Restatement of the Law of Conflict of Laws, even though it had never been a majority rule in the United States, simply because of what was once considered the inexorable, but is now largely discredited, theory of vested rights. Reese, *Conflict of Laws and the Restatement Second*, 28 LAW & CONTEM.PROB. 679 (1963); AM.LAW INSTITUTE, 37th ANNUAL MEETING PROCEEDINGS 494 (1961). The primary virtues of the rule, as found in the first Restatement, were thought to be simplicity and certainty. Cavers, *Restating the Conflict of Laws: The Chapter on Contracts*, in XXth CENTURY COMPARATIVE AND CONFLICTS LAW 349 (1961). The application of the theoretically simple formula to complex phenomena often failed to produce the desired certainty and simplicity. *Id.* The *lex loci contractus* rule is not the easy, certain, and predictable panacea for all cases that it might superficially seem to be. Leflar, *Conflict of Laws, Contracts, and the New Restatement*, 15 Ark.L.Rev. 163, 171 (1961). Some practical difficulties which may render its utility dubious can best be demonstrated by a hypothetical.

What if Mr. Felger had picked up the loan documents himself in Salt Lake City and placed them, unsigned, in his briefcase. Thereafter he boards an airplane from Salt Lake City to his home in California. Once aloft he decides to read over the documents and somewhere en route he signs them. Should the court attempt to ascertain the approximate time of the signing during the flight? By interpolating the pilot's log, should the judge conclude that the law of

---

**1.** Both *Chevron* and *Trans-America* specifically noted that the results in each case would be the same under either the *lex loci contractus* theory or the more contemporary most significant contacts rule set forth in Restatement, Conflict of Laws, Second § 188.

Nevada applies, since that state's air-space was the actual scene or *loci* of the execution of the contract? Or should the governing law be the state of destination? Of the state of embarkation? The absurdity of placing the choice of law *necessarily* on one fortuitous event—the place of execution—seems to be patent. It is not surprising then that at its 1960 meeting, the American Law Institute rejected the primacy of the place of making of the contract theory by a vote of 77 to 36. AM.LAW INSTITUTE, 37th ANNUAL MEETING PROCEEDINGS 505 (1961).

In place of the *lex loci contractus* theory Restatement (2d) of Conflict of Laws § 188 now stands. Section 188 reads as follows:

§ 188 Law Governing in Absence of Effective Choice by the Parties

(1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.

(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, ...

The balance of § 188 factors in this case weighs heavily in favor of Utah law as the governing law. Utah was clearly the place of the negotiations on the contract. Defendants appointed Utah counsel to represent them in negotiating the terms and conditions of the Note, in reviewing the loan documents, and in transmitting to and receiving the loan documents from FSB. Delivery of the Note, the last act necessary to make the Note enforceable, *Bryan v. Bartlett*, 435 F.2d 28, 33 (8th Cir.1970) *cert. denied* 402 U.S. 915, 91 S.Ct. 1373, 28 L.Ed.2d 658 (1971); 11 AM.JUR.2d *Bills and Notes* § 270, was made by CR & S to FSB in Utah. The loan was made by a Utah bank, to help salvage a Utah project. Payments on the loan were to be made in Utah. The Property given as security for the Note in the Trust Deed, managed by Felger since 1981, and central to this entire litigation, is located in Utah. Clearly, the center of gravity of this transaction was Utah.

The court believes that under the circumstances of this case the Utah Supreme Court would find that Utah law governs, accordingly this court proceeds on the same finding.

### 2. *One-Action Rule*

■ Defendants claim that UTAH CODE ANN. § 78–37–1 known as the "one-action rule", acts as a bar to FSB's claim under the CS, Ltd. Note. Section 78–37–1 provides that "there can be one action for the recovery of any debt or the enforcement of any right secured solely by mortgage upon real estate." The "one-action rule" applies to trust deeds as well as mortgages. *See Utah Mortgage and Loan Co. v. Black*, 618 P.2d 43 (Utah 1980); *Lockhart Co. v. Equitable Realty Co.*, 657 P.2d 1333 (Utah 1983). In *Lockhart*, the Utah Supreme Court construed the statute and stated:

Under this and the following section there is no personal liability on the part of the mortgagor until after foreclosure or sale of the security and then only for the deficiency then remaining unpaid; a mortgagee may not have a personal judgment against the mortgagor until the security has been first exhausted.

*Lockhart*, 657 P.2d at 1334.

Defendants contend that because FSB failed to foreclose on the Trust Deed secur-

ing the CS, Ltd. Note, it is precluded from bringing an action against CS, Ltd. or Dan Felger on that Note.

FSB relies upon a well-recognized exception to the "one-action rule" which permits a creditor to refrain from going through the useless motion of foreclosing on real estate which has become valueless by no fault of the creditor. *Lockhart,* at 1336. The Utah Supreme Court has made it clear that the "fault" of the secured creditor which will preclude recovery on the trust deed note must consist of blameworthy or negligent conduct. Thus, in *Black,* the Court stated:

> We proceed upon the premise, accepted by the parties and the trial court, that the so-called "one-action" rule is also a "one-remedy" rule; and that when a creditor uses up the security which it has agreed would stand good for his debt, he may not look to the debtor personally for any deficiency. In any event, *the principle would not apply when the security has been lost or disposed of without any fault or blameworthy conduct on the part of the creditor ...* However, if the security is lost or disposed of because of any failure or neglect of the creditor, he deprives himself both of the right to foreclose on the security and to seek a deficiency from the debtor.

*Black,* at 45 (emphasis added).

The courts have found that a creditor is precluded from seeking a deficiency only where the creditor's negligence, or illegal conduct, has resulted in the loss of the collateral, or where the creditor voluntarily released the junior lien. Thus it has been held that a secured creditor was barred from recovery when (1) the creditor lost its lien because of failure to record a notice of assignment of mortgage, *Donaldson v. Grant,* 15 Utah 231, 49 P. 799 (1897); (2) the creditor released its lien because of its belief that there was no equity in the collateral, *Lockhart, supra;* (3) the creditor disposed of the collateral by private sale under an illegal self-help remedy, *Rein v. Callaway,* 7 Idaho 634, 65 P. 63 (1901) (cited with approval by the Utah Supreme Court in *Black, supra*); and (4) the credi-

tor lost its interest in the collateral because of its failure to present a claim in a related probate proceeding, *Hibernia Savings & Loan Society v. Thornton,* 109 Cal. 427, 42 P. 447 (1895) (cited with approval in *Black*).

In this case, FSB's conduct can hardly be called "blameworthy" or constitute "fault." FSB merely exercised its legal right to foreclose on a lien that was in default. Furthermore, FSB's conduct is even further removed from the classification of "fault" when the undisputed facts of the case are considered. At the time of the foreclosure, FSB was in possession of an appraisal indicating that the value of the Property was $140,000.00 less than the amount in default on the Garner Note. Where, as here, the creditor has taken care to procure a current appraisal of the property and the appraisal shows that the property is worth significantly less than the first position lien, it would be unfair to permit the junior party to decline to pay their loan and then, after the foreclosure, second guess the accuracy of the creditor's appraisal. At the very least, FSB's good faith reliance on the appraisal indicates that its decision to extinguish the second lien was not "blameworthy" or the result of neglect.

In addition, it is clear that the public policy underlying the "one-action rule" would not be served by applying the rule in this case. In *Black* the Utah Supreme Court explained the purpose and operation of the "one-action rule."

> The purpose of the statute was to eliminate harassment of debtors and multiple litigation which sometimes occurred under the common-law rule which allowed a creditor to foreclose and sell the land, and to sue on the note. The statute limits the creditor to one remedy in exhausting his security before having recourse to the debtor for a deficiency.

*Black,* 618 P.2d at 45. The "one-action rule" was enacted to prevent double recovery by creditors, not to completely deny recovery of a legal debt. FSB is not barred by the one-action rule.

### 3. Notice

■ Defendants' contend that FSB was blameworthy, negligent and at fault when it failed to give CS, Ltd. or Felger notice of the foreclosure sale, even though it had actual notice of CS, Ltd.'s correct business address. FSB did send a copy of the notice of sale to the CS, Ltd. address on the Trust Deed. Defendants did not expressly request that FSB send a copy of any Notice of Default or Notice of Sale to any address other than that specified in the Deed of Trust, and FSB was under no obligation to do so. *See* UTAH CODE ANN. § 57–1–26.

### 4. Merger Theory

■ As an alternative defense to FSB's Motion for Summary Judgment, defendants contend that the Deficiency Judgment provisions of UTAH CODE ANN. § 57–1–32 limit FSB's recovery on the Note. Section 57–1–32 limits recovery on notes secured by non-judicially foreclosed trust deeds to a sum equal to the amount the total indebtedness under the note exceeds the fair market value of the property on the day of sale. The purpose of § 57–1–32 is to protect the debtor, who in a non-judicial foreclosure has no right of redemption, from a creditor who could purchase the property at the sale for a low price and then hold the debtor liable for a large deficiency.

Defendants contend that § 57–1–32 applies to them because FSB is the beneficiary of both the Garner Trust Deed, which secured the Garner Note, and the CS, Ltd. Trust Deed, which secured the CS, Ltd. Note. Defendants argue that when FSB foreclosed on the Property under the Garner Note, the lesser estate, here FSB's equitable interest in the subject property under the CS, Ltd. Deed, merged with the greater estate, FSB's equitable interest under the Garner Deed, and that FSB is only entitled to recover as deficiency a sum no greater than the amount by which the total indebtedness on the property, together with interest, costs and expenses of sale, exceeds the fair market value of the property on the day of the sale. They therefore contend that the Christiansen appraisal which defendants obtained on February 10, 1987, which appraised the Property at one million dollars on the day of sale, creates an issue of fact, since that appraisal exceeds the combined debt owing on both the Garner and CS, Ltd. Notes ($999,724.80) at the time of foreclosure.

While there is support for the theory that, under some circumstances, multiple liens held by an obligee against a single obligor can be merged, if the parties so intend, there is no legal support for applying a merger doctrine to the facts present here. *See, First Security Bank of Utah v. Shiew*, 609 P.2d 952 (Utah 1980). Here the first and second Notes involved entirely different obligors. The first Note was solely between FSB and Garner, the second Note solely between FSB and CS, Ltd. There was no intention of the parties involved that the interests be merged. *See, Aladdin Heating v. Trustees of Central States*, 563 P.2d 82 (Nev.1977) (whether merger has occurred depends on intent of parties, especially one in whom interests unite, and if merger is against that party's best interest, it will not be deemed intended by the parties). Moreover, while it makes some sense to require a creditor to foreclose all obligations it holds against a single defaulting obligor at once, it does not follow that a creditor must commence simultaneous foreclosure proceedings against separate obligors. Defendants' unprecedented merger theory is rejected.

### III. Conclusion

Because all contacts in this transaction other than the execution of the loan documents, were in the State of Utah, Utah law governs this case. The "one-action rule" does not apply as a bar to FSB's collection of the CS, Ltd. Note. FSB's good faith reliance on an independent appraisal indicating the value of the property to be significantly less than the amount owing under the prior obligation establishes that the extinguishment of the second lien was not a result of any neglect or blameworthy conduct on the part of FSB. Additionally, no basis in law exists for merging liens which secure the obligations of two different obligors.

Accordingly,

IT IS HEREBY ORDERED that First Security Bank's Motion for Summary Judgment is granted and CS, Ltd. and Dan Felger's Motion for Summary Judgment is denied.