**TRANS–AMERICAN COLLECTIONS,
INC., an Illinois Corporation,
Plaintiff,**

v.

**CONTINENTAL ACCOUNT SERVICING
HOUSE, INC., a Utah corporation,
et al., Defendants.**

No. C–138–69.

United States District Court,
D. Utah, C. D.

May 30, 1972.

W. Robert Wright and Ronald J. Ockey, Salt Lake City, Utah, for plaintiff.

Wayne L. Black, George E. Bridwell, Brant H. Wall, Salt Lake City, Utah, and Matt Biljanic, Midvale, Utah, for defendants.

## OPINION

RITTER, Chief Judge.

Plaintiff, Trans-American Collections, Inc. (TAC), formed in 1964, is an Illinois corporation which provides a flat-rate letter account collection service. Defendants are: Continental Account Servicing House, Inc. (CASH), a Utah corporation formed in 1968 which provides a similar collection service; Eugene S. Simpson, former regional manager for TAC and present general manager for CASH; Gale L. Palmer, former sales manager for TAC under Simpson's supervision and incorporator and president of CASH; and E. Reed Palmer, former TAC sales agent under Simpson and an incorporator of and sales agent for CASH. Prior to trial, the complaint against defendants Minson, Ham, Golden and Weber was dismissed.

In July of 1967, TAC entered into a "Systems Selling Agreement" with Gene Simpson and Associates, the name under which Simpson was doing business. Under the terms of the contract, Simpson was granted the exclusive sales agency for TAC's service in Arizona, California, Colorado, Idaho, Nevada, Oregon, Utah, Washington and Wyoming. Simpson covenanted to devote his full time and effort to the sale of TAC's collection service, to pay the expenses of establishing the service in his territory, to keep his salesmen under surety bond, to purchase advertising and sales kits from TAC, and to remit 40% of the gross sales. TAC covenanted in return to furnish transmittal forms, to sell advertising and sales kits at cost, to turn over all orders, reorders and inquiries from Simpson's territory, and to allow Simpson to retain 60% of the gross sales. The contract was terminable upon a year's notice or violation of the contract's conditions and contained a covenant that Simpson would not compete with TAC for a period of two years anywhere in the United States upon termination of the contract.

## TERMINATION OF THE CONTRACT

Simpson operated under the contract for over a year, organizing a sales force and selling TAC's service in all of his territory except Oregon. On November 9, 1968, TAC's president personally handed Simpson a letter which terminated the contract and listed the grounds for termination. Defendants contend that TAC had no right to terminate the contract and they counterclaim for alleged breach of the contract by TAC.

After examining the evidence, however, I find that TAC had ample justification for terminating Simpson's contract. First, Simpson failed to comply with the terms of the contract—he failed to pay for sales kits, furnish the monthly list of sales representatives, see that his salesmen were bonded, and forward all of TAC's share of the gross sales. Second, Simpson breached his duty of loyalty as TAC's agent. Three of TAC's regional managers testified that Simpson approached them at TAC's national convention with offers to become directors and regional managers of a company he was forming to compete with TAC. He told them he had financing and would be ready within thirty to ninety days, and that their contracts with TAC were not binding. He called them the week after

the convention to renew his offer, and when they informed TAC's president of the offer, Simpson's contract was terminated. Simpson immediately contacted people throughout the West, requesting their attendance at a meeting held two days later for the purpose of organizing CASH. Although the contract characterizes Simpson as an independent contractor, he is not precluded from also being TAC's agent (especially since he was authorized to enter into sales contracts which bound TAC to perform its service), and his attempt to persuade other TAC agents to breach their contracts was a serious breach of his duty of loyalty. Third, Simpson's distinct and unequivocal expression to TAC's agents of his intent to commence a competing business in the near future constituted an anticipatory repudiation of his contract. Under principles of agency and contract, TAC was entitled to terminate the contract.

## BREACH OF COVENANT NOT TO COMPETE WITH TAC

■ On November 22, 1968, defendants Gale and Reed Palmer, together with Doris Weber, incorporated defendant CASH. Gale Palmer became president and Simpson became general manager. Although not an incorporator, officer or director, Simpson admitted that he was a motivating force in forming CASH and is principally responsible for the conduct of its business. From its inception, CASH has competed with TAC—selling its services in 26 states (including California, Colorado and Utah) in which TAC has done business.

■ Defendants argue first that the covenant is unenforceable because its application to the entire United States is unreasonable and second because California has a statute which invalidates such a covenant. In diversity actions, the court must look to the rules of the forum state to determine which state's law applies to the merits of the case. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In determining the validity and enforceability of contract provisions, Utah courts apply the *lex loci contractus* rule and look to the law of the place of the making of the contract. Crofoot v. Thatcher, 19 Utah 212, 57 P. 171 (1899). The contract was negotiated and signed by Simpson in Denver and thus Colorado law should be applied. Colorado law, however, would also apply if Utah had adopted the most significant contacts rule set forth in Restatement, Conflict of Laws, Second § 188. The contract was also partially performed in Colorado where Simpson maintained an apartment and a telephone. Therefore, Colorado, not California, law determines the validity of the covenant. (It should be noted that California Business and Professions Code § 16600 does not apply when the covenant is necessary to protect trade secrets, including customer lists as in this case. See Muggill v. Reuben H. Donnelley Corp., 62 Cal.2d 239, 42 Cal. Rptr. 107, 398 P.2d 147 (1965), and Gordon v. Landau, 49 Cal.2d 690, 321 P. 2d 456 (1958).)

■ The Colorado Supreme Court has upheld (at least in part) covenants not to compete in eleven of the twelve such cases it has considered. In Wagner v. A & B Personnel Systems, Ltd., 473 P.2d 179 (1970), the Colorado Court of Appeals gave this explanation of the Colorado rule:

"The rule is well settled in Colorado that reasonable agreements not to compete will be enforced and that reasonableness will depend upon the facts in each case. Zeff, Farrington & Associates, Inc. v. Farrington, 168 Colo. 48, 449 P.2d 813. Restrictions in contracts which regulate competition, to be valid, must be reasonable, must not impose undue hardship, and must be no wider than necessary to afford the desired protection. Knoebel Mercantile Co. v. Siders, 165 Colo. 393, 439 P.2d 355." Id. at 180.

The covenant not to compete must (1) be necessary for the protection of some legitimate interest of the employer, (2) not be unduly harsh or oppressive on the employee, and (3) not deprive the public

of the employee's skills and services. Furthermore, the courts are more likely to enforce a relatively broad covenant when the employee has an important position and a large area of operations. See, e. g., De Long Corp. v. Lucas, 176 F.Supp. 104 (S.D.N.Y.1959), aff'd, 278 F.2d 804 (2nd Cir. 1960), cert. denied, 364 U.S. 833, 81 S.Ct. 71, 5 L.Ed.2d 58 (1960), upholding a two-year covenant not to compete anywhere in the world.

Defendants contend that the sole purpose of the covenant was to create a nation-wide monopoly for TAC. TAC's approach to account collection, however, was not widely used when TAC was started. TAC has acquired leadership in this field by expending large sums for product development (e. g., its four-part transmittal form and computer operation) and advertising. The purpose of the covenant was to insure that a regional manager with no previous collection experience could not learn about TAC's service and sales system, gain the necessary experience to obtain a collection agency license, obtain customer lists, become well-known among TAC's salesmen and then immediately form a competing company staffed with TAC representatives.

Defendants further contend that Simpson was only given a nine-state territory and that the covenant cannot reasonably embrace states in which he performed no services. Simpson's influence, however, extended (as could be expected) far beyond his own territory. TAC enhanced his reputation within the company through sales clinics, reproducing Simpson's sales presentations, and inviting him to speak at its national sales convention, where he was praised as the company's best salesman. In addition, Simpson admitted that he was aware of the covenant when he signed the contract and made no objection at that time.

Simpson was merely restrained for two years from competing in the flat-rate account collection letter business in the United States. That is not an unreasonable restriction on his right to employment since he is a career salesman with skills and experience that can be effectively applied in the sale of another service or product.

■ Defendants urge reliance on the case of Knoebel Mercantile Co. v. Siders, 165 Colo. 393, 439 P.2d 355 (1968), as authority that the covenant ought not to be enforced. In Knoebel, the court held that a covenant restricting a salesman from selling for a competitor for two years in seven states and any other states where plaintiff transacted business was unreasonable. That salesman's territory, however, was limited to one city and its vicinity—with only 150 customers. The court found that there was no need for the covenant since he had not obtained any information to divulge to a competitor. Moreover, the court observed that the competitor's business was much more limited in its scope than was plaintiff's business. The finding in Knoebel does not support the contention that Simpson's covenant was unreasonable. At any rate, if the geographical extent of the covenant were unreasonable, this court could modify the covenant to apply only to the territory assigned to Simpson. See Whittenberg v. Williams, 110 Colo. 418, 135 P.2d 228 (1943); Gulick v. A. Robert Strawn & Associates, Inc., 477 P.2d 489 (Colo.App.1970); and Wagner v. A & B Personnel Systems, Ltd., supra.

Simpson is therefore liable for breach of his covenant not to compete for two years after termination of the contract. Defendants CASH, Gale Palmer and Reed Palmer are liable for inducing and encouraging Simpson to breach the covenant (and possibly for breach of the covenants not to compete which were in the contracts between Simpson and the Palmers—TAC being a third-party beneficiary).

## UNFAIR COMPETITION

Defendants engaged in three types of unfair competition. First, Simpson and CASH, through its agents, misappropriated TAC's customer lists and used them as a source of referrals and leads. Second, twelve witnesses from Utah,

California and Nevada testified that CASH salesmen led them to believe that CASH was the same as TAC, or that CASH was taking over for TAC. Such acts of "palming off" CASH as TAC are in violation of 15 U.S.C. § 1125(a), which imposes liability for " . . . use in connection with any goods or services . . . [of] a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same. . . . " Specifically, Reed Palmer told one witness that CASH was the same company as TAC. Third, defendants attempted systematically to destroy TAC's sales force by inducing TAC representatives to breach their covenants not to compete and to leave TAC on the false promise of receiving higher commissions with CASH.

■ Defendants argue that CASH's sales representatives were independent contractors over whom Cash had no control, and that CASH is therefore not responsible for their misrepresentations. The simple answer to that argument is that designating the representatives "independent contractors" does not preclude them from also being agents.

## DAMAGES AND INJUNCTION

■ TAC presented evidence of lost profits and damage to its goodwill in Utah and Southern California as a result of defendants' competition. (Plaintiff's Exhibit #90.) Lost profits due to competition in Utah were determined by comparing TAC's gross sales in Utah during 1968, 1969 and 1970 with TAC's gross sales in Colorado, Nevada and Wyoming. The latter states adjoin Utah, are economically similar, and are states in which Simpson had represented TAC but in which CASH had only minor sales in 1969 and 1970. TAC sales in those states declined 40.28% from 1968 to 1969 and increased 159.34% from 1968 to 1970. Applying these percentages to

TAC's 1968 Utah sales ($102,611) produces a projected decrease of $41,332 in 1969 and a projected increase of $163,500 in 1970. The estimated lost sales for 1969 and 1970 in Utah were then determined as follows:

| 1969 | | 1970 | |
|---|---|---|---|
| 1968 sales | $102,611 | 1968 sales | $102,611 |
| 1969 decrease | −41,332 | 1970 increase | +163,500 |
| expected sales | 61,279 | expected sales | 266,111 |
| actual sales | − 9,054 | actual sales | −10,264 |
| lost sales | $ 52,225 | lost sales | $255,847 |

TAC's variable expenses (incurred in providing the collection service—not including fixed expenses) were 80.88% of gross sales in 1969 and 81.63% in 1970. Reducing the lost sales by those percentages results in a net profit loss of $9,986 in 1969 and $46,999 in 1970, for a total net profit loss of $56,985 in Utah. TAC estimates its loss of goodwill due to defendants' competition in Utah to be $116,882. This figure is arrived at by trebling TAC's loss of profits in 1970 (it is estimated that it will take three years to recover from defendants' competition) and discounting the product to present value.

TAC determined its losses in California in a similar manner. TAC's 1970 gross sales in Southern California ($335,337) were substantially lower than those in Northern California ($627,861), even though the two sections are similar in population and area and notwithstanding that TAC had over 55% more salesmen in the south than in the north during that year. TAC contends that the difference was caused by defendants' acts of unfair competition in Southern California. The result is a net profit loss of $53,731 after applying the variable expense factor for 1970 (81.63%). The damage to goodwill in California is based on an estimated two years to achieve parity between north and south and is estimated to be $93,261 (discounted to present value). However, I am not convinced that the comparison between

Northern California and Southern California is as valid as the comparison between Utah and its adjoining states. First, a comparison of plaintiff's record of earnings during the period of defendants' wrongful acts and plaintiff's earning record during a prior period supports the comparison and the damage which occurred in Utah. A similar comparison cannot be made in California, for the earnings in California, statewide, substantially increased during the period of defendants' wrongful acts, albeit the increase may not have been as large as would have been the case in the absence of the wrongful acts. Second, TAC presented evidence of unfair competition in Santa Rosa, California (which is north of San Francisco), which suggests that factors other than defendants' competition may have caused the disparity between north and south. On balance, I believe the proof of damages in California is insufficient to warrant the award of the amount of damages estimated in California. Some damages should be awarded for the malicious, wrongful acts which have occurred which undoubtedly caused damage which I determine to be at least $10,000.

In addition, TAC seeks $8,000 which it had to guarantee its Utah state sales manager for efforts to salvage TAC's business in Utah and $2,456 for TAC's portion of sales made by Simpson but never paid to TAC.

TAC is entitled to a judgment against Eugene S. Simpson, Continental Account Servicing House, Inc., Gale L. Palmer and E. Reed Palmer, jointly and severally, for damages in the amount of $194,-323, together with reasonable attorneys fees and costs, for breach of the covenant not to compete and engaging in unfair competition. TAC is also entitled to punitive damages against Simpson and CASH in the amount of $75,000 for the wilful and malicious manner in which they have competed with TAC. Finally, TAC is entitled to an order enjoining each of the defendants for committing further acts of unfair competition against TAC.