VOLUNTEER FIREMEN'S INSURANCE SERVICES, INC., Foundry Insurance Agency, Inc., Ambulance Insurance Services, Inc., Municipal Services Agency Inc., and Arthur J. Glatfelter Inc.,

v.

CIGNA PROPERTY AND CASUALTY INSURANCE AGENCY, Alaska Pacific Assurance Company, Atlantic Employers Insurance Company, Bankers Standard Insurance Company, CIGNA Fire Underwriters Insurance, CIGNA Insurance Company, CIGNA Insurance Company of Illinois, CIGNA Insurance Company of The Midwest, CIGNA Insurance Company of Ohio, CIGNA Insurance Company of Texas, CIGNA Insurance of North America, Pacific Employers Insurance Company, and Century Indemnity Company, Appellants.

Superior Court of Pennsylvania.

Argued Jan. 8, 1997.

Filed May 7, 1997.

---

Beginning in 1969, Arthur Glatfelter, chairman of the Glatfelter Insurance Group, developed a series of coverages designed especially for emergency service organizations ("ESO").[3] The efforts of Mr. Glatfelter, and later VFIS, led not only to the creation of a distinctive program of coverages for the specialty market of ESO coverage, but also to the development of a national marketing and distribution system for this coverage. Presently, VFIS is the largest agent/distributor in the specialty insurance market of ESO coverage, accounting for approximately 40% of the national market.

Paul M. Hummer, Philadelphia, for appellants.

Rees Griffiths, York, and Howard I. Langer, Philadelphia, for appellees.

Before CAVANAUGH, JOHNSON and EAKIN, JJ.

CAVANAUGH, Judge.

This is an appeal from a final decree which enjoined Cigna Property and Casualty Insurance Company ("CIGNA")[1] from: (1) competing with Volunteer Firemen's Insurance Service, Inc. ("VFIS")[2]; (2) directly or indirectly soliciting, selling or issuing a voluntary property/casualty policy to any volunteer fire business for a period of three years; and (3) directly or indirectly using, disclosing or retaining any trade secrets or confidential information of VFIS. After careful review, we affirm.

The relationship between VFIS and CIGNA began in 1972 when CIGNA's predecessor, the Insurance Company of North America, became the exclusive insurer/underwriter for the Glatfelter Agency and VFIS. Two-thirds of the total premium volume for CIGNA's special programs unit was business generated by VFIS. Under its agreement with CIGNA, VFIS received commissions, service fees and a percentage of profits. VFIS was responsible for marketing, product development, distribution, limited underwriting and claims processing. CIGNA acted as the exclusive insurer and its responsibilities included systems support, claims, underwriting and loss control services. During the course of their business relationship, CIGNA had access to VFIS confidential information and other information not readily attainable through public sources.

The parties' relationship was governed by two written agreements. In 1990, CIGNA cancelled the first of these agreements. Thereafter, negotiations began regarding a new agreement between the parties. A new agreement and addendum were not executed

---

1. Cigna Property and Casualty Insurance Company and its co-defendants are all licensed property and casualty insurance companies operating under the umbrella of CIGNA.

2. VFIS and its fellow plaintiffs are all subsidiaries of the Arthur J. Glatfelter Agency, Inc.

3. ESO's include fire companies, ambulance squads, rescue squads and similar entities which provide emergency services. The insurance market consisting of these organizations was referred to by the parties as "volunteer fire business."

until 1994.[4] During negotiations, VFIS insisted that a noncompetition provision be included in the addendum. CIGNA initially resisted the inclusion of such a provision, but later relented and agreed to the inclusion of a noncompetition provision. The effective date of the agreement and addendum was made retroactive to January 1, 1993 and was to run until December 31, 1995, with automatic renewal for successive one year terms unless timely notice was given.

In May, 1994, before the new agreement was reached with CIGNA, VFIS began strategic planning for an alternative risk structure. Among VFIS's concerns were increased competition in the ESO market, control over costs, pricing and risks, and CIGNA's financial stability rating. VFIS also formed an offshore reinsurance company and consulted with an insurance consultant, Tillinghast, regarding future strategic planning. VFIS did not advise CIGNA of these actions or its plans. On October 28, 1994 (after the new agreement and addendum had been executed) VFIS retained Tillinghast to assist in identifying potential insurance and reinsurance companies which could act as a replacement carrier for CIGNA. Tillinghast created a request for proposal ("RFP") to send to companies it thought suitable to VFIS's plans. The RFP discussed the arrangement, structure and role that each company would have in the new venture.

In the meantime, CIGNA's insurer rating was downgraded to B++ on December 21, 1994. The addendum entered into by CIGNA and VFIS provided that VFIS could terminate the governing addendum for cause after a downgrade of CIGNA's insurer rating below A-. VFIS did not exercise this option,

but rather, informed CIGNA that it was willing to aid CIGNA in its attempts to restore its prior rating. It did, however, send the RFP to several selected insurers/reinsurers. CIGNA was not initially among the insurers to which the RFP was sent. Once CIGNA's rating was restored to A-, on February 10, 1995, the RFP was sent to CIGNA by VFIS. CIGNA, unaware of the RFP process until this point in time, established a response team to consider its alternatives, including: maintaining the current contractual relationship with VFIS; submission of a proposal in conformity with the requirements outlined in the RFP; and entry directly into the ESO market in competition with VFIS. CIGNA ultimately submitted a proposal in response to the RFP. VFIS subsequently informed CIGNA that another company had been selected and that its proposal had been rejected. Although this action did not formally terminate the addendum, it would have been clear to CIGNA at this point that its relationship with VFIS would end in the near future.

In June, 1995, CIGNA and VFIS agreed to an extension of the addendum until May 31, 1996, with an agreed ninety days notice of nonrenewal, in order to create an orderly transition. In early 1996, CIGNA decided to enter the ESO market in competition with VFIS. On February, 16, 1996, VFIS sent written notice of its intent not to renew the addendum for another one year term. CIGNA then informed VFIS of its intention to enter the ESO market. In response, VFIS filed a "motion for preliminary injunction" and "complaint for declaratory judgment and equity." Following a hearing at which extensive testimony was taken and hundreds of exhibits were admitted, the trial court enjoined CIGNA from competing with VFIS in the volunteer fire business for a period of three years and from retaining or disclosing VFIS's trade secrets and confidential information.[5] This appeal by CIGNA followed.

---

**4.** CIGNA executed the agreement and addendum on July 21, 1994. VFIS executed the agreement and addendum on September 1, 1994. The agreement governed generally the relationship between the subsidiaries of the Glatfelter Agency and the property and casualty insurers operating as part of CIGNA. The addendum governed

specifically the CIGNA–VFIS relationship vis-a-vis the ESO insurance business and is the document which is directly at issue in this case.

**5.** The final decree entered by the trial court stated as follows:

 CIGNA first contends that Pennsylvania does not recognize the legality of a noncompete provision that would prohibit an insurer from selling insurance to policyholders. More specifically, CIGNA argues: (1) the trial court impermissibly extended Pennsylvania law based on § 188(2) of the Restatement (Second) of Contracts; and (2) the noncompete provision is contrary to the public interest because it stifles competition and leaves current VFIS and CIGNA policyholders no option to either choose or remain with CIGNA.[6]

With respect to the first of these contentions, CIGNA asserts that Pennsylvania has traditionally enforced covenants not to compete in only two contexts: employment and the sale of a business. It maintains that a covenant not to compete in an insurer/agent agreement does not fall within either of these categories and is thus unenforceable.[7] The trial court noted that the CIGNA/VFIS relationship was not a typical insurer/agent arrangement, but rather, was a unique business arrangement akin to a joint venture or partnership. The court further stated that although no Pennsylvania case addressed the validity of a restrictive covenant in this circumstance, it was "satisfied that Pennsylvania law recognizes the relationship of joint venturers as a proper one to support an enforceable restrictive covenant." In support of its conclusion that a noncompetition covenant would be appropriate and enforce-

---

AND NOW, TO WIT: This 26th day of September, 1996, we order and decree the following:

1. The prayer of the Petition of Plaintiff VFIS is granted, and Defendant CIGNA is enjoined from competing with VFIS in contravention of the provisions of Section 10 of the VFIS Addendum to the Agency/Company Agreement dated to be effective as of January 1, 1993.

2. Defendant CIGNA is enjoined for a period of three (3) years from June 1, 1996, from directly or indirectly soliciting, selling or issuing a voluntary property/casualty policy to any Volunteer Fire Business, except for Volunteer Fire Business which is part of a municipal account. The prohibition shall apply to all of the ESO market identified in Section 1 of the VFIS Addendum

3. CIGNA is enjoined from, directly or indirectly, using, disclosing or retaining any trade secrets or confidential information of VFIS, including but not limited to, any information which relates to research, computer and management information systems, expiration dates, claims procedures, development, purchasing, finances, profit sharing, acquisition activity, accounting, non-public rating information, underwriting loss ratios, engineering marketing, merchandising, planning and selling or the identity of present and prospective customers, agents and regional directors. Nothing in this Decree shall preclude CIGNA from maintaining such records as it is required to maintain by law or from making use of such records to carry out any duties imposed by statute or regulation. Notwithstanding the above, access to such records shall be limited to persons actively involved in carrying out said duties and solely for the purpose of carrying out such duties. CIGNA shall continue timely to provide VFIS all information respecting claims,

losses and loss development related to the VFIS book of emergency service organization business as was provided prior to May 31, 1996.

**6.** The latter argument will be discussed *infra* as part of CIGNA's challenge regarding Pennsylvania public policy and federal antitrust law.

**7.** The cases relied upon by CIGNA, *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 351 A.2d 207 (1976); *George W. Kistler, Inc. v. O'Brien*, 464 Pa. 475, 347 A.2d 311 (1975), *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838 (1957) and *Davis & Warde, Inc. v. Tripodi*, 420 Pa.Super. 450, 616 A.2d 1384 (1992) do not prohibit the enforcement of the type of restrictive covenant at issue in this case. In reviewing the enforceability of restrictive covenants, our courts have placed primary focus on whether the restraint (covenant) is ancillary to the main purpose of the agreement rather than on the nature of the relationship between the parties. The controlling question thus is stated, whether the promisee has a protectible interest such that a reasonable covenant not to compete, effective upon termination of the agreement, would be enforceable against the promisor. Thus, the fact that the instant relationship cannot fit neatly into one of the above categories, does not render it *per se* unenforceable. *See Piercing Pagoda, supra* (while caselaw is silent as to validity of restrictive covenant in a franchise agreement, covenant's enforceability is governed by the general principle that a reasonable covenant not to compete will be enforced where franchisor has protectible interest in sale of franchise to promisor). It is only where the sole object of both parties in making the contract is to restrain trade or control prices that the covenant will be declared void.

able in the instant business relationship, the trial court cited the Restatement (Second) of Contracts, § 188(2), which states in pertinent part:

> (2) Promises imposing restraints that are ancillary to a valid transaction or relationship include the following:
>
> * * *
>
> (c) a promise by a partner not to compete with the partnership.
>
> * * *

COMMENT

> h. *Promise by a Partner.* A rule similar to that applicable to an employee or agent applies to a partner who makes a promise not to compete that is ancillary to the partnership agreement or to an agreement by which he disposes of his partnership interest. The same is true of joint venturers, who are treated as partners in this respect.

Restatement (Second) of Contracts § 188(2)(c). In view of existing Pennsylvania caselaw, *see note 7, supra,* the Restatement approach to noncompetition agreements between partners and/or joint venturers, and the circumstances of this case, we conclude that a noncompete provision similar to the one at issue in this case is enforceable under Pennsylvania law.

■ As a general rule, an independent insurance agency has a proprietary interest in the clientele it develops. *See Rights to Expirations as Between Insurer and Insurance Agent or Broker,* 88 A.L.R. 1142. Moreover, where the agreement between insurer and agent confirms the agent's ownership of policy expirations and renewals, the insurer may not use policyholder information to solicit insureds directly or disclose

this information to others for that purpose. *Id.* In addition to these general precepts, the circumstances of the CIGNA–VFIS relationship militate in favor of recognizing a covenant not to compete. VFIS is not a typical independent agent selling a standard insurance policy. Rather, VFIS conceived of and developed the specialized program of coverages for ESO's, developed the national market for this coverage and developed a nationwide distribution system consisting of regional directors, brokers and subagents. Aside from its role as the exclusive insurer, CIGNA's functions were limited to services not directly involved with the marketing, development and distribution of ESO policies. In light of the nature of this relationship, the fact that the noncompete provision was entered into by sophisticated parties, well versed in the insurance business, and that VFIS possessed legitimate protectible interests in confidential information and trade secret data related to its specialized coverages and distribution system, we conclude that a noncompete provision was both recognizable under Pennsylvania law and enforceable in this case.

■ We further note that the instant noncompete provision meets the requirements imposed by our courts for enforceability of noncompetition covenants. In order to be enforceable, a covenant not to compete must be: (1) ancillary to the main purpose of a lawful transaction; (2) necessary to protect a party's legitimate interest;[8] (3) supported by consideration; and (4) appropriately limited as to time and territory. *Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255, 265 (7th Cir. 1981); *Piercing Pagoda, supra.* After careful review of the record before us, we find that each of these requirements has been met.

■ With regard to the first element, we note that the principal purpose of the CIGNA–VFIS agreement and addendum was to

---

**8.** In *Piercing Pagoda, supra,* the first two elements were examined under the more general inquiry of whether the covenant related to either a contract of employment or a sale of a business. As the *Piercing Pagoda* court explained, this general inquiry, included the more specific questions of whether the covenant was ancillary to the main purpose of a lawful business transaction and whether it was necessary to protect a party's legitimate interest.

create a relationship through which insurance for ESO's would be written and distributed. The noncompete provision allowed VFIS to share confidential information and trade secrets with CIGNA with the assurance that this information would not later be used in direct competition with VFIS. As such, the noncompete provision was ancillary to the main purpose of the CIGNA–VFIS relationship. *See note 7, supra; Consultants & Designers v. Butler Service Group,* 720 F.2d 1553 (11th Cir.1983)(for restrictive covenant to be reasonable, promisee must have some legitimate protectible interest); *Trans–American Collections, Inc. v. Continental Acct. Serv. Inc.,* 342 F.Supp. 1303 (D.C.Utah 1972)(to be enforceable, restrictive covenant must be necessary for protection of some legitimate interest of promisee).

■ With respect to the second requirement, we also conclude that the noncompete covenant was necessary to protect a legitimate property interest of VFIS. As more fully related *supra,* VFIS possessed legitimate property interests in the specialized program of coverages it developed, the customer base and distribution network it developed, the goodwill it acquired and the confidential information and trade secrets it accumulated in the twenty plus years in the ESO insurance business. A three year noncompete provision is appropriate to protect these interests. *See note 7, supra; Consultants & Designers, supra; Trans–American, supra.*

■ The noncompete provision was also supported by adequate consideration. The parties agreed to a three year contract pursuant to which CIGNA would act as the exclusive underwriter of the ESO insurance policies developed and marketed by VFIS. *See Insulation Corp. of America v. Brobston,* 446 Pa.Super. 520, 667 A.2d 729 (1995)(new consideration consists of corresponding benefit or beneficial change in status of relationship).

■ Finally, in view of VFIS's vulnerability to competition from CIGNA, (due to CIG-

NA's knowledge of its business methods and strategy), a three year noncompetition provision was reasonable. As the trial court stated, "[t]he three year term ... provides the breathing space necessary to permit [VFIS] to enter the market in its new role ... and assume the additional responsibilities associated with its enhanced role in the new arrangement." The court further noted that this period of noncompetition would allow the confidential information held by CIGNA to grow stale.

■ We also conclude that the noncompetition provision's nationwide scope was reasonable. During their relationship, the parties marketed VFIS's specialized ESO insurance nationally through the distribution system established by VFIS. In these circumstances, the territorial scope of the covenant was comparable to the market actually serviced during the course of the CIGNA–VFIS relationship. *Cf. Kramer v. Robec, Inc.,* 824 F.Supp. 508 (E.D.Pa.1992)(nationwide bar on competition reasonable where employer's business covers entire country).

■ CIGNA next contends the noncompete provision was not triggered by VFIS's "nonrenewal" of the addendum because it is only applicable upon "termination" of the addendum. It maintains that termination did not occur in accordance with section 9 of the addendum, but rather, VFIS simply gave notice of nonrenewal pursuant to section 8 of the addendum. As such, CIGNA argues that the noncompete provision was never triggered and should not be enforced.

The noncompetition provision of the CIGNA–VFIS addendum is contained in section 10 and provides, in pertinent part, as follows:

*Section 10. Non–Compete*

Acknowledging the longstanding relationship between you and us, we together agree as follows. For a period of three (3) years following *any termination* of this Addendum, except termination for those grounds set forth in Sections 9.b.1., 9.b.2. or 9.b.3., we agree that we will not directly or indirectly solicit, sell or issue a volun-

tary Property/Casualty policy to any Volunteer Fire Business, except for Volunteer Fire Business which is part of a municipality account.

(emphasis added). Section 8 of the addendum provides, in pertinent part:

*Section 8. Term*

a. The initial term of this Addendum shall commence on January 1, 1993 and continue through and including December 31, 1995. Thereafter the addendum shall be automatically renewed and extended for successive one year terms unless written notice of intent not to renew is given to the other party at least 180 days prior to the next January 1 automatic renewal date. *If we non-renew* under this paragraph, we agree that *for 180 days after notice of termination is given*, we will provide quotations for new business inception within that 180-day period for risks which are acceptable under our underwriting standards.

(emphasis added). Section 9 of the addendum provides alternative methods of termination of the addendum, including automatic termination, termination for cause and termination in the event of termination of the underlying agreement between the Glatfelter Agency and CIGNA.

 To determine the intent of contracting parties, we look to the language contained in the written contract. *Liazis v. Kosta, Inc.*, 421 Pa.Super. 502, 618 A.2d 450, 454 (1992). When the words of the contract are unequivocal, they speak for themselves, and a meaning other than that expressed cannot be given to them. *Lindstrom v. Pennswood Village*, 417 Pa.Super. 495, 612 A.2d 1048, 1051 (1992). We will not rewrite the contract or give it a construction that conflicts with the plain, ordinary and accepted meaning of the words used. *Id.*

The trial court concluded that neither the agreement nor addendum defined "termination" and therefore it must be given its plain and ordinary meaning (as defined by *Black's Law Dictionary*, 5th Edition, (1978)):

"end in time or existence; cessation; conclusion." The court further concluded that the parties used the terms "non-renewal" and "termination" interchangeably.

After careful review of the record in this case, particularly the agreement and addendum, we reject CIGNA's argument that the non-renewal of the addendum did not trigger the noncompetition clause. Section 10 of the addendum (the noncompete provision) speaks of "termination" broadly, as it specifically provides, "For a period of three years following *any termination* of this addendum ... we [CIGNA] will not directly or indirectly solicit, sell or Business." (emphasis added). Moreover, although section 9 provides circumstances under which the addendum would terminate, this section covers only specific instances involving automatic termination or termination for cause. There is no indication that this list is exhaustive or that the definition of termination is otherwise limited to those situations outlined in section 9. Finally, from the language of section 8, "If we *non-renew* under this paragraph, we agree that for 180 days after notice of *termination* is given ...", it is clear that the parties contemplated non-renewal as one method of termination.

 We find support for our conclusion in *Carvel Corp. v. Eisenberg*, 692 F.Supp. 182 (1988). In *Carvel*, the parties' agreement contained a three year noncompetition covenant which was triggered if the agreement was "terminated for any reason except for the licensor's breach." After the prescribed term of the agreement expired, the licensee tried to avoid enforcement of the noncompetition covenant by arguing that the agreement "expired" rather than "terminated". In rejecting this argument, the court quoted *Carvel Corp. v. Rait*, 117 A.D.2d 485, 503 N.Y.S.2d 406 (1986):

The foregoing language evinces an understanding by the parties that the covenant would apply in the event of any termination of their agreement (other than one brought about by Carvel's breach). The parties further understood that the lan-

guage was to include the expiration of the agreement at the end of its stated term. Indeed, as noted by Special Term, Webster's New Collegiate Dictionary (1974), defines the word "expiration," in part, as "termination".... We can perceive no basis for concluding that the parties intended to provide Carvel with less protection from competition or dilution of its trade name in the event of expiration than in the event of some earlier termination of the license agreement.

*Carvel v. Eisenberg, supra,* 692 F.Supp. at 185 (quoting *Carvel v. Rait, supra,* 503 N.Y.S.2d at 410). As such, this claim fails.[9]

 CIGNA next contends that the noncompete provision is unenforceable because it was obtained by fraud and/or misrepresentation. In support, CIGNA alleges that at the time the noncompete clause was being negotiated, VFIS had already decided to terminate the agreement and compete directly with CIGNA, VFIS intentionally concealed these plans and that its objective was to force CIGNA out of the ESO market.

 An action for fraud consists of proof, by clear, precise and convincing evidence of the following elements: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention by the maker that the recipient will act; (4) justifiable reliance by the recipient upon the misrepresentation; and (5) damages to the recipient as the proximate result. *Krause v. Great Lakes Holdings, Inc.,* 387 Pa.Super. 56, 563 A.2d 1182, 1187 (1989); *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882 (1994).

After reviewing the record, we find that CIGNA has not proffered sufficient evidence

to prove fraud. VFIS, while in difficult negotiations with CIGNA, investigated alternative business arrangements which did not include CIGNA. Although VFIS continued this investigation after the addendum with CIGNA was executed, it is noteworthy that the addendum only had approximately one year to run at this point and any decision by VFIS to terminate the addendum would have to be made within six to eight months. In light of the short term of the addendum (three years subject to automatic one year renewals unless terminated) and the increasingly competitive nature of the ESO market, it is not surprising that VFIS carefully investigated and considered all of its present and future options. CIGNA as a large sophisticated business entity, would likely have considered the eventuality that VFIS might at some future date terminate their business relationship. CIGNA's president himself conceded as much at trial. In view of the record before us, we find no evidence of bad faith, fraud or misrepresentation on the part of VFIS. VFIS simply investigated and considered future alternatives in light of the circumstances at the time of negotiations with CIGNA and for the foreseeable future. Any prudent business entity would have done the same. Moreover, we note that VFIS did not terminate the relationship when CIGNA's insurer rating dropped below contractually mandated levels. VFIS's conduct in this instance and its assurance that it would work with CIGNA to rectify the situation belie CIGNA's allegations of misrepresentation, manipulation and bad faith. As such, this issue is meritless.

CIGNA next contends that the noncompete provision is an unreasonable restraint in

9. We likewise reject CIGNA's contentions that (1) section 8 was amended and (2) the trial court impermissibly relied on extrinsic evidence in resolving this issue. With respect to the former allegation, we find no support in the record. The only change agreed to by the parties was an extension of the addendum until May 31, 1996, with 90 days notice of non-renewal, for the purpose of creating an orderly transition. There is no indication that this agreement would, in any way, affect what action constituted termination or prevent the enforcement of the noncompetition provision.

With respect to the latter allegation, we likewise find no merit. Ordinary meanings are given to words unless circumstances show that a different meaning is applicable. *Rothstein v. Aetna Ins. Co.,* 216 Pa.Super. 418, 268 A.2d 233 (1970). Although a dictionary definition of a word must give way to use of the word made in the contract, *Galvin v. Occidental Life Ins. Co.,* 206 Pa.Super. 61, 211 A.2d 120 (1965), there is no inconsistency between the dictionary definition and the use of "termination" in the addendum.

violation of Pennsylvania common law because: (1) VFIS's interests in the confidential data and trade secrets are already protected by a confidentiality provision; (2) the noncompete provision is not tailored to the protection of confidential information, but rather, it prevents CIGNA from competing, on the basis of its own information and marketing techniques, in the entire ESO market in the United States; and (3) the noncompete provision fails to properly balance the injury to policyholders and CIGNA against the marginal benefit to VFIS's legitimate interests.

■■■ In cases dealing with the enforceability of restrictive covenants, our courts will only permit restrictions which are reasonably necessary to the protection of the party seeking to enforce the covenant. *Thermo–Guard, Inc. v. Cochran,* 408 Pa.Super. 54, 596 A.2d 188, 193 (1991); *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 351 A.2d 250, 252 (1976). In doing so, the court will consider whether the promisee's need for protection is outweighed by the hardship of the restriction to be imposed upon the promisor. *Insulation Corp. of America, supra,* at 530, 667 A.2d at 734.

After reviewing the court's order in light of the record before us, we find that the restrictions imposed by the trial court were reasonably necessary to protect VFIS's interests and that this need outweighed any hardship imposed upon CIGNA. The record supports the trial court's findings that VFIS could not control the market price of ESO policies, that the ESO market was highly competitive and that it would remain so in the absence of CIGNA. During the initial period of its new business arrangement, VFIS would be particularly vulnerable to competition, especially from CIGNA, as it tried to solidify its market position. CIGNA possessed intimate knowledge of VFIS's business strategies, trade secrets and confidential information. This knowledge would place it in a unique position to compete with VFIS and undermine it in the early stages of its new venture. The record reflects that

CIGNA planned to enter the ESO market as soon as practicable, to target VFIS's customer base and to use VFIS's confidential information in preparing to compete with VFIS. In these circumstances, precluding CIGNA from competing with VFIS for three years was reasonable in that it would allow VFIS to seek to protect its market position and preserve it as a competitor in the ESO market. Moreover, its confidential information would grow stale during this period. Finally, policyholders would not be injured as the number of insurers in the ESO market would remain the same.

■■■ CIGNA next contends that the noncompete provision is illegal under federal antitrust laws. Specifically, it argues that: (1) the noncompete provision is *per se* illegal as a horizontal restraint of trade and (2) it violates the rule of reason.

With respect to the first of these contentions, each of the cases cited by CIGNA, *Polk Bros. v. Forest City Enter., Inc.,* 776 F.2d 185 (7th Cir.1985), *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990), and *United States v. Topco Assocs.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) involves a situation in which markets were divided among competitors and the respective courts found these arrangements to be a *per se* violation of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* As noted by the trial court, this is clearly not the situation in the case at bar.

■■■ Turning to the latter contention, we likewise find no merit. In applying the rule of reason in the context of an antitrust challenge to a restrictive covenant, we must determine whether the covenant is an attempt to monopolize a particular market so as to constitute an unreasonable restraint of trade. *Barr Laboratories Inc. v. Abbott Laboratories,* 978 F.2d 98, 110–12 (3rd Cir.1992). Three factors must be established: (1) a specific intent to monopolize the relevant market; (2) engaging in anticompetitive conduct; and (3) being possessed of sufficient market power to come dangerously close to success. *Id.*

**1342**

A review of the record reveals that while VFIS is a dominant figure in the ESO market, it does not have the resources or market share to create a monopoly. VFIS controls between 30% and 40% of the ESO market. Considering the highly competitive nature of the ESO market, that VFIS is a much smaller entity than many of its competitors and that there are few barriers to entry into the market, VFIS will be unable to exclude competitors from the market or control prices. The noncompete provision will only be in effect for a relatively brief period before CIGNA can enter the market. Moreover, it will not reduce the number of competitors in the ESO market, but only temporarily prevent CIGNA from adding to the ranks of such insurers. As such, we conclude that federal antitrust law does not bar enforcement of the noncompete provision.

◼ Finally, CIGNA contends that enjoining it from writing insurance for policyholders who never had a relationship with VFIS exceeds the scope of the noncompete provision. The addendum defines "volunteer fire business" as a broad market of ESO's. It does not limit this definition to only those ESO's which have or had a preexisting relationship with VFIS and CIGNA. Our review of the entire addendum confirms that volunteer fire business was intended by the parties to be interpreted in its broadest sense. We reject CIGNA's final claim.

We have reviewed each of the issues raised by CIGNA and have concluded that the noncompetition provision at issue in this case is both cognizable and enforceable in Pennsylvania and that the nonrenewal of the addendum by VFIS triggered the addendum's noncompetition provision. We have also rejected CIGNA's claims of fraud and public policy and antitrust violations. As such, the decree of the trial court is, in all respects, affirmed.

DECREE affirmed.

