UNPUBLISHED

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

MICHAEL S. FRANCIS, an individual;
WILLIAM E. CARPENTER, JR., in his
capacity as the executor of the
estate of Jenny L. Francis; MICHAEL
H. SCHWARTZ, an individual,
                    *Plaintiffs-Appellees,*

v.

PennPower, INCORPORATED, a
Delaware corporation; TAMROCK
CORPORATION, formerly known as
Tampella Corporation,
                    *Defendants-Appellants.*

No. 02-1138

Appeal from the United States District Court
for the Northern District of West Virginia, at Wheeling.
Frederick P. Stamp, Jr., District Judge.
(CA-99-151-5)

Argued: September 25, 2002

Decided: December 10, 2002

Before TRAXLER, Circuit Judge, HAMILTON,
Senior Circuit Judge, and Claude M. HILTON,
Chief United States District Judge for the
Eastern District of Virginia, sitting by designation.

Vacated and remanded with instructions by unpublished per curiam
opinion.

**COUNSEL**

**ARGUED:** Helen Louise Gemmill, MCNEES, WALLACE & NUR-ICK, L.L.C., Harrisburg, Pennsylvania, for Appellants. James Knight Brown, Sr., JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Appellees. **ON BRIEF:** Stephen R. Crislip, Jeffrey G. Wilhelm, JACKSON & KELLY, P.L.L.C., Charleston, West Virginia, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The plaintiffs brought this breach-of-contract action in state court, alleging that the defendants, PennPower, Inc. (formerly known as Sawco) and Tamrock Corporation (formerly known as Tampella Corporation), owed them $250,000 under the terms of a stock option agreement. The action was removed to federal court on the basis of diversity of citizenship. *See* 28 U.S.C.A. § 1332(a) (West 1993 & Supp. 2002). After a bench trial, the district court ruled in favor of the plaintiffs and awarded them $250,000, plus interest. The defendants appeal. We vacate the order of the district court and remand with instructions to enter judgment in favor of the defendants.[1]

I.

In 1990, Piney Creek Limited Partnership ("Piney Creek") was formed for the development, construction, and operation of a power plant in Pennsylvania. Piney Creek's general partner was MidAtlantic

---

[1]In its order, the district court rejected a counterclaim raised by the defendants. Because the defendants did not file a cross-appeal, there is no issue before us as to that counterclaim.

Energy of Pennsylvania, Inc. ("MAE"); the plaintiffs were MAE's sole shareholders at that time. Piney Creek's limited partner was Tampella Power Corporation ("TPC"), a subsidiary of Tampella Corporation. TPC was in the business of manufacturing industrial boilers, and its initial involvement in the Piney Creek project was to assist MAE with development costs and to provide MAE with standby credit in exchange for the exclusive right to supply the boiler for the project. After an equity infusion in May 1993, Sawco (now known as PennPower, Inc.), another subsidiary of Tampella Corporation, became the limited partner. MAE remained the general partner, but had only a 1% ownership interest in Piney Creek after the equity infusion. Sawco owned the remaining 99%, but, as a limited partner, had no say in the management of the partnership.

Construction of the plant began falling behind schedule, and MAE was unable to find an operations and maintenance contractor for the project. To protect the equity it had already invested in the project through Sawco, Tampella Corporation created Tampella Services, another subsidiary, to serve as the operations and maintenance ("O&M") contractor. Swiss Bank Corporation, the project's primary lender, conditioned its approval of Tampella Services as the O&M contractor upon Tampella Corporation posting a letter of credit to support Tampella Corporation's $2 million cost overrun guaranty. By its terms, the letter of credit was to expire on December 1, 1994.

Meanwhile, Sawco and MAE had begun discussing the possibility of a realignment of their interests in Piney Creek, and they ultimately agreed to a sale of all MAE stock to Sawco. The terms of this agreement were set forth in a stock option agreement (the "Agreement") executed on November 15, 1993. Under the terms of the Agreement, Sawco could initiate the transfer by "calling" MAE's shares, or MAE could initiate the transfer by "putting" the shares. If Sawco called the shares, the purchase price was $1,355,000. If MAE opted to put the shares, it could require Sawco to purchase its shares for the same price, provided that three specified conditions were met at the time of the exercise of the put; if the conditions were not met when the put was exercised, the Agreement called for a total purchase price of $1,105,000. The Agreement, however, provided that, after the exercise of the put, "[a]n additional $250,000.00 shall be payable . . . if and when all of the Conditions have thereafter been satisfied." J.A.

345-46. The Agreement also included the following termination clause:

> Except with respect to the representations and warranties set forth in Paragraphs 11 and 12 hereof and to covenants set forth in Paragraphs 6 and 7 hereof, all of which shall be without limitation, this Option Agreement, and the obligations of Sellers, Tampella and Sawco hereunder, shall automatically terminate upon June 30, 1994, at 5:00 p.m., EDT, unless such termination shall be sooner accomplished by closing on the Put or Call hereunder.

J.A. 360.

While the plant construction was falling behind schedule, problems were also developing with the general contractor, who eventually left the project. Tampella Services entered into a "remediation" agreement with the Piney Creek partnership through which Tampella Services agreed to complete the project. Swiss Bank made $1 million available for the remediation, but required that the letter of credit securing the cost overrun guarantee remain in place until the remediation was completed. The remediation, which for a time was projected to be completed by June 30, 1994, was not completed until December of that year. Although Swiss Bank initially sought an extension of the letter of credit, the bank allowed the letter of credit to expire on December 1, 1994, with no draw having ever been made against it.

The power plant became operational and began earning revenues even before all construction was completed. Until construction was completed, however, Swiss Bank controlled the release of construction funds and the revenue earned through the operation of the plant. Swiss Bank authorized the use of the plant's revenues to pay operating expenses beginning on January 1, 1994. However, because of a problem with the project's 1993 budget, Swiss Bank refused to release funds to pay Tampella Services for O&M charges incurred from March 1993 through December 1993. By the end of 1993, the unpaid O&M charges amounted to approximately $1.5 million.

In 1994, Swiss Bank released approximately half of the unpaid O&M charges, but it refused to release the balance of the funds unless

Sawco paid a fee of $450,000 to compensate Swiss Bank for what the bank perceived to be below market fees that it had earned for financing the project. Sawco refused to pay the fee, believing it unreasonable to pay $450,000 to receive $750,000 that it was entitled to receive and expected that it would receive. Swiss Bank never released the funds for the remaining O&M charges, and the receivable was "written off" in late 1994 or early 1995.

On January 5, 1994, the plaintiffs exercised their right to put the shares of MAE. At the time of the exercise, two of the conditions upon which the payment of the additional $250,000 was dependent were not satisfied. Near the end of 1994, the plaintiffs became aware that Sawco was negotiating with a third party for the sale of Sawco's interests in the power plant. Counsel for the plaintiffs then began asking Sawco whether the conditions set forth in the Agreement had yet been satisfied, to which Sawco responded in the negative. Sawco did not sell its interests in the Piney Creek project until 1997. Convinced that the conditions must have been satisfied by the time of the sale, the plaintiffs sought payment of the additional $250,000. The defendants refused, contending that under the Agreement, its obligation to make the $250,000 payment terminated on June 30, 1994, in accordance with the termination clause. The defendants also contended that even if the termination clause did not apply to the obligation to pay the $250,000, no payment was required because the conditions had never been satisfied. This action followed.

The district court concluded that the termination clause applied only to the exercise of the put or call (and certain other obligations connected to the exercise) and that it did not apply to the defendants' obligation to pay the additional $250,000 upon satisfaction of the conditions. The court concluded that the conditions had been satisfied and that the plaintiffs were therefore entitled to payment of the $250,000, plus prejudgment interest at the rate of six percent (as provided by Pennsylvania law) beginning January 1, 1995.

## II.

On appeal, the defendants first contend that the district court erred by concluding that the termination clause did not apply to the obligation to pay the additional $250,000. We need not address that ques-

tion, however, because we agree with the defendants that even if the termination clause does not apply, no payment is due because two of the three conditions were never satisfied.[2]

### A.

Two of the conditions upon which the $250,000 payment was dependent were directed to issues surrounding the $2 million letter of credit and the payment of the O&M charges. The first condition ("Condition A") required by the Agreement was "[t]he execution by Swiss Bank Corporation ("SBC") as lead lender to the Project of a written agreement with Tampella Corp[oration] . . . . on terms which require the payment or posting of no additional moneys or recourse to SBC . . . to the effect that SBC will cause the release of Tampella's entire $2,000,000 cost overrun guaranty upon (aa) commercial conversion of the Project and (bb) remediation of certain Project construction defects . . . by the Contractor or Sawco within a budget reasonably determined by SBC." J.A. 346. The second condition ("Condition B") was "[t]he agreement by SBC, on terms reasonably acceptable to Sawco, to release [Piney Creek partnership] funds and/or Project operating revenues for the payment of the Project operator's O&M charges from and after March 6, 1993." J.A. 346.

### B.

The district court concluded that Condition A was satisfied when the letter of credit expired by its own terms on December 1, 1994. We disagree.

The Agreement required Swiss Bank to "cause the release" of the $2 million dollar letter of credit. Under Pennsylvania law (which, under the terms of the Agreement, governs the substantive issues in this case),[3] terms of a contract must be given their plain and ordinary

---

[2]There is no dispute that the third condition was satisfied.

[3]See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941) (holding that a federal court sitting in diversity must apply the choice-of-law rules of the forum state); Nationwide Mut. Ins. Co. v. West, 807 A.2d 916, 920 (Pa. Super. Ct. 2002) ("In contract disputes, Pennsylvania courts generally honor the parties' choice of law provisions.").

meaning. *See, e.g.*, *Volunteer Firemen's Ins. Servs. v. Cigna Prop. & Cas. Ins. Agency*, 693 A.2d 1330, 1339 (Pa. Super. Ct. 1997) ("When the words of the contract are unequivocal, they speak for themselves, and a meaning other than that expressed cannot be given to them. We will not rewrite the contract or give it a construction that conflicts with the plain, ordinary and accepted meaning of the words used." (internal citation omitted)). "Release," as it is generally understood, refers to the giving up of an existing and enforceable right or claim. *See Black's Law Dictionary* 1289 (6th ed. 1990) (defining "release" as "[t]he relinquishment, concession, or giving up of a right, claim, or privilege, by the person in whom it exists or to whom it accrues, to the person against whom it might have been demanded or enforced"). Thus, the requirement that Swiss Bank "release" the letter of credit must be understood as requiring that Swiss Bank consent to an early termination of the letter of credit. Merely allowing the letter of credit to expire in accordance with its terms cannot be considered a release of the letter of credit, because allowing the natural expiration of the letter of credit did not require Swiss Bank to give up anything to which it had an enforceable claim. *See id.* at 579 (defining "expiration" as "[c]essation; termination from mere lapse of time, as the expiration date of a lease"). The district court therefore erred by concluding that Condition A was satisfied upon the expiration of the letter of credit. *See, e.g.*, *Scarborough v. Ridgeway*, 726 F.2d 132, 135 (4th Cir. 1984) ("We have repeatedly held that interpretation of a written contract is a question of law subject to *de novo* appellate review."); *accord Seven Springs Farm, Inc. v. Croker*, 801 A.2d 1212, 1216 n.1 (Pa. 2002).[4]

---

[4]The plaintiffs contend the district court's determination that the Condition A was satisfied is a factual one that should be reviewed under the clearly erroneous standard. In some cases, of course, the determination of whether a contractual condition was satisfied will be a factual one. But here, the question is whether the expiration of the letter of credit satisfied Condition A's requirement that Swiss Bank release the letter of credit, a question that can be answered only by determining the meaning of Condition A. Thus, the question is one of contract interpretation and is reviewed *de novo*.

## C.

As to Condition B's requirement that Swiss Bank agree, "on terms reasonably acceptable to Sawco," to release funds to pay the O&M charges incurred after March 1993, the district court concluded that the condition was satisfied when the bank allowed the plant's operating revenues to be applied to expenses incurred beginning as of January 1, 1994. As to the O&M expenses incurred between March and December of 1993, the court noted that Swiss Bank released half of the funds sought by the defendants and offered to release the balance upon payment of a $450,000 fee, but that the Sawco "continued its demand for payment of the labor expenses." J.A. 298. The court stated that "[w]hile this Court feels that this particular condition has been satisfied, it also feels that if the condition failed, it was attributed to the actions of the defendants, or some of the defendants, and not to any act or omission of the plaintiffs." J.A. 298.

Certainly, Swiss Bank's release of operating revenues for payment of expenses incurred as of January 1994 did partially satisfy Condition B. But Condition B required Swiss Bank's agreement as to the release of funds for O&M charges incurred after March 1993; Swiss Bank's release of operating revenues for 1994 expenses left unresolved the question of payment for expenses incurred between March and December 1993. Because Swiss Bank released only half of the funds due for the 1993 O&M charges, Condition B was never satisfied. Whether the plaintiffs bore any responsibility for Swiss Bank's failure to release the remaining funds is simply irrelevant. Condition B clearly and only required that Swiss Bank agree to release all of the funds on terms reasonably acceptable to Sawco; it made no exception for funds withheld through no fault of the plaintiffs. *See Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982) ("It is not the province of the court to alter a contract by construction or to make a new contract for the parties; its duty is confined to the interpretation of the one which they have made for themselves, without regard to its wisdom or folly." (internal quotation marks omitted)).

The plaintiffs, however, suggest that we should nonetheless treat Condition B as satisfied. According to the plaintiffs, Sawco acquiesced to Swiss Bank's partial release "by failing to press the issue" after Swiss Bank conditioned the final release upon payment of

$450,000. This argument is again resolved by looking to the plain language of the Condition B, which required Swiss Bank to release all funds "on terms reasonably acceptable to Sawco." The evidence presented to the district court established that Sawco believed it ultimately would be paid in full for the remaining 1993 O&M charges and that it concluded it would be unreasonable to pay $450,000 to receive $750,000 that it was entitled to receive and would in fact receive. The plaintiffs presented no evidence to the contrary, and there is no other evidence in the record that could support a conclusion that Sawco's position on the issue was unreasonable. Accordingly, to the extent that the district court's decision should be construed as including a factual finding that the defendants' actions with regard to the remaining O&M charges were unreasonable, that finding lacks evidentiary support and is clearly erroneous. *See, e.g.*, *Consolidation Coal Co. v. Local 1643, United Mine Workers of America*, 48 F.3d 125, 128 (4th Cir. 1995)("A finding is clearly erroneous if no evidence in the record supports it. . . .").

The plaintiffs also suggest, albeit without explanation, that their position is supported by the fact that Sawco wrote off the balance of the 1993 O&M receivable and later sold its interest in the Piney Creek project. We are puzzled by this argument. First, we fail to see how an accounting entry acknowledging that payment would not be forthcoming can somehow be treated as satisfaction of a condition that payment actually be made. Second, while Sawco did receive compensation when it sold its interest in the power plant in 1997 to a third party, that sale simply has no bearing on the question of whether Swiss Bank ever agreed to the release of the balance of funds for the 1993 O&M charges, as required by Condition B.

Because Swiss Bank's terms were not reasonably acceptable to Sawco and Swiss Bank did not release all of the funds required by the plain language of Condition B, Condition B was never satisfied. The district court erred in concluding otherwise.

### III.

After considering the plain and unambiguous language of the Agreement and the undisputed facts presented in this record, we conclude that Conditions A and B were never satisfied and that the defen-

dants therefore had no additional monetary obligation to the plaintiffs. We therefore vacate the district court's orders and we remand with instructions to enter judgment in favor of the defendants. Our disposition of this issue makes it unnecessary to consider the defendants' challenge to the district court's award of pre-judgment interest.

*VACATED AND REMANDED WITH INSTRUCTIONS*