## Synthes USA Sales LLC v. Harrison

*Anthony B. Haller, Leah Ann Buziak, Andrew B. Cohen, Thomas A. Riley, Jr.* and *Jonathan W. Bradbard,* for plaintiff.

*Matthew A. Taylor, Lawrence A. Pockers* and *Carla H. Bennett,* for defendants.

TUNNELL, *J.,* May 19, 2014—On December 13, 2012, this court held a hearing on the motion for a preliminary injunction of Synthes USA Sales, LLC ("Synthes") to enforce defendant Peter Harrison's 2007 confidentiality, non-solicitation, and non-competition agreement ("2007 agreement"). At that time, proceeding under California law and having determined that Synthes demonstrated it had proprietary data and information that was confidential or met the definition of trade secret, the court issued an injunction protecting certain confidential information. After Synthes appealed this court's choice of law decision, the Pennsylvania Superior Court concluded that Pennsylvania law governed the 2007 agreement. Synthes thereafter renewed its request for injunctive relief and now seeks the full protection available under the 2007 agreement, including its non-solicitation provisions. On May 1, 2014, the court held a hearing to address the issues raised by Synthes's most recent request for injunctive relief.

Synthes argues that this court must enforce all of the prohibitions contained in the 2007 agreement given the evidence presented at both of the hearings held in this matter. It seeks an injunction restricting Harrison's activities for one year from the date of the most recent hearing to ensure that Synthes gets what it calls the "benefit of its bargain" or at the very least a period of twelve months from the date of the last breach or violation of the applicable non-solicitation covenant — November 2, 2013.

Defendants counter that such an injunction is not appropriate now because more than a year has passed since the initiation of the injunctive proceedings and the subsequent appellate proceedings. They argue that at this late date Synthes cannot establish the "irreparable harm" required for injunctive relief.

Contrary to defendants' assertions, Synthes has demonstrated that a broader injunction should be issued in this case and, in support thereof, the court makes the following findings of fact:

## FINDINGS OF FACT

1. Synthes is a leader in the medical device industry and is based in Chester County, Pennsylvania. It designs, manufactures and sells various devices for use in orthopedic surgery for the internal fixation and repair of the skeleton. (N.T. 12-13.)[1]

2. Synthes is a successor to Synthes Spine Company, L.P. as a result of a merger by conversion under Delaware law. Synthes's sole member is Synthes USA HQ, Inc., a

---

1. Citations to "Notes of Testimony" refer to testimony given at the December, 2012 hearing. The May, 2014 hearing has not yet been transcribed. References to a witness' testimony without citation refer to the testimony given at that hearing.

Delaware corporation, which, in turn, is a wholly-owned subsidiary of Synthes, Inc., a Delaware corporation. (Verified complaint ("Verif. compl.") ¶ 6.)

3. On June 14, 2012, pursuant to an agreement and Plan of Merger, Synthes, Inc. became a wholly-owned subsidiary of Janssen Pharmaceutical, a company organized under the laws of Ireland. Janssen Pharmaceutical, in turn, is a wholly-owned subsidiary of Johnson & Johnson, a New Jersey corporation. The merger was effected for the purpose of integrating Synthes with the DePuy Companies of Johnson & Johnson. (*Id.*)

4. The integrated Synthes and DePuy entities are now commonly known as the DePuy Synthes Companies of Johnson & Johnson. (*Id.*)

5. Synthes's customers include, but are not limited to, hospitals, hospital employees who influence or may influence the use or purchase of medical devices from Synthes, including materials management, operating room, sterile processing, and related personnel, and physicians who use or may use the devices supplied by Synthes, and their partners, employees, and staff nurses (collectively, "Customers"). (N.T. 14-16, 34; Verif. compl. ¶13, Synthes Ex. 3.)

6. Harrison testified that he has been working in sales for the medical device industry in California since 2004.

7. Harrison worked in medical sales for one year before joining Synthes. During that year, he worked for Pacific Medical, Inc. and later following a buyout OsteoCare, Inc. (Synthes Ex. 30.)

8. From 2004 until he joined Synthes in 2005, Harrison focused on sales of a bone growth stimulator sold by

Pacific Medical, Inc., and later OsteoCare, Inc. (*Id.*)

9. Harrison commenced employment with Synthes as an associate sales consultant on October 3, 2005 and began working with an experienced sales consultant to support Synthes customers in and around Sacramento, California. (Harrison Aff. ¶¶1-2;[2] Synthes ex. 2.)

10. Upon joining Synthes as an associate sales consultant in 2005, Harrison signed a confidentiality, non-solicitation, and non-competition agreement and an employee innovation and non-disclosure agreement (the "2005 agreement"). (Synthes ex. 2; N.T. 90; Harrison aff. ¶¶3-4.) The 2005 agreement prohibited Harrison for a period of one year after the termination of his employment with Synthes from: (1) soliciting customers and prospective customers of Synthes and (2) competing with Synthes in the same territory in California. (Harrison Aff. ¶4; Synthes ex. 2.)

11. On January 1, 2007, Synthes promoted Harrison to sales consultant for the Sacramento North territory of Synthes. As such, Harrison had sole sales responsibility in this territory, and remained in this position until his resignation on November 2, 2012. (Synthes exs. 3, 19.)

12. Upon his promotion to the position of sales consultant in 2007, which involved a new special compensation arrangement and the assignment of a territory for which he was responsible, Synthes asked Harrison to sign a new confidentiality, non-solicitation, and non-competition agreement (the "2007 agreement") which contained a non-solicitation covenant (hereinafter "NSC") and he did so. (N.T. 90-91; Synthes ex 3; Harrison aff. ¶5.)

---

2. Herein, "Harrison Aff." refers to the affidavit of Peter Harrison filed with this court on November 20, 2012.

13. Harrison and Jacqueline Meister, the Director of Synthes Human Resources at the time, executed the 2007 Agreement containing the NSC in connection with Harrison's promotion to the position of sales consultant. (Synthes ex. 3; N.T. 90-91.)

14. If he had not signed the 2007 agreement, Synthes would not have promoted Harrison, assigned him a territory, or given him access to Synthes's customers. (N.T. 92.)

15. Synthes is engaged in a highly competitive business in which the protection of its confidential, proprietary, and trade secret information is vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage. (N.T. 21, 26, 30-31;verif. compl. ¶14.)

16. The 2007 agreement contains the following provisions:

SALES CONSULTANT

CONFIDENTIALITY, NON-SOLICITATION AND NON-COMPETITION

AGREEMENT

\*\*\*

CONFIDENTIALITY

I understand that Synthes's proprietary, confidential and trade secret information includes (without limitation): (1) the identity of customers and prospects, their specific requirements, and the names, addresses and telephone numbers of individual contacts; (2) prices, renewal dates and other detailed terms of customer and supplier contracts and proposals; (3) pricing policies,

methods of delivering services and products, marketing and sales strategies, product know-how, product technology and product development strategies . . . I agree that, at all times during and after my employment with Synthes, I will not disclose or communicate any of this information to any competitor or other third party, or use or refer to any of this information for any purpose, including but not limited to in the course of future employment for myself...

## NO CONTACT WITH OR SOLICITATION OF CUSTOMERS & PROSPECTS

I agree that, during my employment and for a period of twelve (12) months after my employment with Synthes terminates for any reason, voluntary or involuntary, I will not solicit, contact or provide services to (or attempt to any of the foregoing), directly or indirectly, for the purpose or effect of competing or interfering with any part of Synthes's business: (1) any Customer of Synthes within my assigned territory . . . "Customer" shall include, without limitation, hospitals; hospital employees who influence or may influence the use of or purchase of medical devices in the business . . . and physicians who use or may use the devices supplied within the business.

\* \* \*

## REMEDIES AND REFORMATION:

I acknowledge that it would be extremely difficult to measure the damages that might result from any breach by me of this agreement, and that a breach may cause irreparable injury to Synthes or the third-party beneficiaries that could not be compensated by

money damages. Therefore, Synthes and any of the third-party beneficiaries will be entitled to enforce this agreement by obtaining a court order prohibiting me from breaching this agreement. The limitations in this agreement which apply for a period of twelve (12) months after termination shall be enforced by a court from the date of the last breach or violation of the applicable restriction(s). If a court decides that any provision of this agreement is not enforceable for any reason, then the rest of this agreement will not be affected. If a court decides that any provision of this agreement is too broad, then the court may limit and/or reform that provision and enforce it as limited and/or reformed. A decision by Synthes or any third-party beneficiary to enforce certain breaches of this agreement but not others shall not be construed as a waiver of any possible remedy that Synthes or any third-party beneficiary has for my breach of this agreement regardless of any claims that I may have against Synthes.

17. Synthes invests significant sums and efforts in providing extensive training to all sales consultants, including Harrison. This includes basic training, fundamental training, and advanced training in various specialty areas. (N.T. 17, 89-90.)

18. As a result, Synthes's sales consultants are very highly trained and very important to Synthes. Their training is considered to be state-of-the-art and proprietary. (N.T. 89-90.)

19. Harrison acknowledged Synthes's legitimate business interest in its employee training in his 2007 agreement and agreed that "Synthes invests substantial time, money, and effort on an ongoing basis, to train its

employees with specialized skills and knowledge unique to Synthes and its business." (Synthes ex. 3.)

20. A Synthes sales consultant's key responsibility is to have the requisite technical knowledge to be useful to the surgeon using Synthes's devices. The sales consultant is present in the operating room for that purpose. He or she also does the reordering and spends time with hospital staff to secure the all-important purchase orders. (N.T. 14-16.)

21. Mr. Harrison was aware of all of this. During his tenure, in order to be successful in the industry, Harrison availed himself of Synthes's specialized, extensive training. (N.T. 27; Synthes ex. 4.)

22. In addition to specialized training, Synthes supplies significant information to its sales consultants that it would not want a competitor to know, including the business plan for the entire year, the "playbook." (N.T. 19-21.) The business plan includes strategies and tactics for increasing business.

23. A Synthes Sales consultant has access to daily reports which break out relevant information by account, by region, by product segment and by surgeon preferences. (N.T. 20.)

24. Sales consultants are told this information (the pricing information, master sheets, and associated codes) is not to be given to competitors.

25. Harrison attended regional meetings two or three times a year where Synthes shared confidential information with attendees. During these meetings, Synthes disclosed so-called "pipeline information," including the development of products, some of which

would be considered revolutionary, as to which Synthes would not want Globus or anyone else to beat them to the market (N.T. 30).

26. Synthes informed sales consultants like Harrison that this was "to stay in-house." The word "confidential" was displayed on the classroom screen (N.T. 28).

27. One of the reasons such information is so highly guarded by Synthes is that it engages in what it calls "special pricing" with certain hospitals. These arrangements/relationships are essentially "private deals," the existence of which Synthes does not want competitors such as Globus to know. (N.T. 25). Concomitantly, disclosure of even the existence of unique contracts would put Synthes in a bad light. (N.T. 27).

28. Harrison was privy to such special pricing arrangements with customers, including a capitated contract with Sutter Health, the negotiated prices of which Synthes wanted to keep confidential from competitors who would otherwise have the ability to undercut Synthes in the market. Harrison likewise had knowledge regarding negotiations surrounding unique pricing arrangements for Dignity Health and Enloe Medical Center, both of which were in Harrison's assigned territory. (N.T. 24-27.)

29. Harrison received confidential product information, such as pricing information for the Anterior Cervical Interbody Spacer (ACIS) in October 2012. At the time, ACIS was a new product to which Harrison was able to get a limited release before other sales consultants had access to this product. (N.T. 29-30; Ex. 14.)

30. Harrison acknowledged in his 2007 agreement that "from the outset of and during [his] employment with Synthes, [he] ha[d] had and [would] continue to have access

to, receive, learn, develop and/or conceive…information that is proprietary and/or confidential to Synthes;" that the information "must be kept in strict confidence to protect Synthes's business and maintain its competitive position in the marketplace," and that "[the] information would be useful to Synthes's existing and potential competitors for indefinite periods of time…." (Synthes ex. 3.)

31. At Synthes, the sales consultants develop relationships over a period of time with the spine surgeons even though it is actually the hospital that is the "customer". The sales consultant learns the physician's preferences. Two doctors in the same practice might perform the same surgery a very different way. (N.T. 31-32.) Synthes will even custom-make devices for use by a particular surgeon. (N.T. 31.) Such information takes a long time to gather and fine-tune. (N.T. 32.)

32. Harrison's principal responsibility as a sales consultant is to have the requisite technical knowledge to be useful to the surgeons that are using Synthes's products.

33. At Synthes, Harrison established, developed and maintained strong relationships over a period of time with individual surgeons such as Drs. French, Prasad, and Whitlatch, all of whom were consistent users of Synthes products.

34. Harrison recognized that preserving customer relationships and goodwill were legitimate business interests of Synthes. He agreed in the 2007 agreement that "from the outset of and during [his] employment with Synthes, [he] ha[s] had and will continue to have access to and will be required to maintain, develop and initiate customer relationships and goodwill that are valuable to Synthes and which it has a legitimate interest in protecting.

(Synthes ex. 3.)

35. Upon resigning from Synthes on Friday, November 2, 2012, Harrison started working in the same capacity for Synthes's competitor, Globus. (N.T. 28, 37; Harrison aff. ¶7.)

36. Globus is a citizen of the State of Delaware and the Commonwealth of Pennsylvania. Globus is headquartered in Audubon, Pennsylvania. (N.T. 28.)

37. Globus competes in the same medical device industry as Synthes and is a direct competitor of Synthes. (N.T. 28).

38. Harrison's first official day of employment with Globus was November 5, 2012, the Monday immediately following his resignation from Synthes. (N.T. 38, 51.)

39. Harrison contacted, solicited, provided services to, and made Globus sales to the top Synthes customers in his territory from his first day. (Synthes ex. 042). These former customers included prominent surgeons Drs. French and Prasad. (N.T. 36-39.)

40. Synthes's business with Drs. French and Prasad, formerly very strong Synthes users, immediately ceased upon Harrison's departure. (N.T. 38-42.) Their business flipped to Globus. (N.T. 39, 41; Synthes ex. 16 (Prasad), 17 (French).)

41. A Synthes sales consultant also witnessed Harrison in the purchasing manager's office at Sutter General Hospital, a Synthes customer for which Harrison had responsibility. The sales consultant overheard Harrison say "Don't I need to give you any pricing on this?" He then witnessed Harrison's gesturing to a Globus product brochure and verbally compared that product to a

competing Synthes product that was the first of its kind in the marketplace, and for which Synthes had a confidential pricing arrangement. (N.T. 72-77.)

42. Harrison, in an apparent effort to transfer business to Globus, sent an email on November 15, 2012 to Scarlet Rhoads, a program coordinator at Enloe Medical Center. In the email titled "meeting opportunity," Harrison leveraged his knowledge from his prior employment with Synthes. (Synthes ex. 31.) He wrote that his knowledge of Enloe's contract with Synthes would help in any future dealings she/Enloe would have with Harrison and Globus. (*Id.*)

43. Harrison also made similar overtures to other surgeons and relayed contact with Synthes product to Globus personnel users via email. (Synthes exs. 32, 33).

44. Harrison, in the employment application submitted to Globus, requested that Globus not contact his former employer, Synthes. (Synthes ex. 30.)

45. Despite its awareness of Harrison's contractual obligations to Synthes, Globus employed Harrison in a position that will require Harrison to solicit his former Synthes Customers in direct violation of the 2007 agreement. (N.T. 89, 93-94; Ex. 11.)

46. Globus was certainly aware of the existence of the NSC and the restrictions placed on the activities of Synthes's former employees. Synthes and Globus have a "history" in the courts already. (N.T. 94.)

47. Synthes sent Globus a letter soon after Harrison's departure that advised Globus of the NSC. (Synthes ex. 11.)

48. Within a half hour of giving his notice, Harrison initiated an action for declaratory relief in the federal

District Court for the Eastern District of California based upon his 2005 agreement and seeking relief from its restrictions.

49. After much procedural wrangling, the matter eventually was reassigned to the undersigned, who held an initial conference with the parties and then scheduled an evidentiary hearing. That hearing took place on December 13, 2012.

50. Following that proceeding, the court entered an amended Injunction order, in accordance with California law, with regard to certain of Synthes's confidential information.

51. Following an appeal to the Superior Court and its conclusion that Pennsylvania law should be applied to the 2007 agreement, the matter was remanded to this court for further proceedings in accordance therewith.

## DISCUSSION

## I. SYNTHES IS ENTITLED TO A PRELIMINARY INJUNCTION UNDER PENNSYLVANIA LAW.

In order to obtain preliminary injunctive relief, Pennsylvania law requires that the requesting party show: (1) that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages; (2) that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings; (3) that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct; (4) that the activity it seeks to restrain is actionable, that its right to relief is

clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits; (5) that the injunction it seeks is reasonably suited to abate the offending activity; and, (6) that a preliminary injunction will not adversely affect the public interest. *Warehime v. Warehime*, 580 Pa. 201, 209-10, 860 A.2d 41, 46-47 (2004).

A. Synthes's Restrictive Covenant is Enforceable and It Is Likely to Prevail on Its Underlying Claims.

Restrictive covenants in employment agreements are enforceable if (1) they are incident to an employment relationship between the parties; (2) the restrictions imposed by the covenant are reasonably necessary for the protection of the employer; and (3) the restrictions imposed are reasonably limited in duration and geographic extent. *Hess v. Gebhard & Co.*, 570 Pa. 148, 158, 808 A.2d 912, 917 (2002). Because such covenants are commonly relied upon by employers to shield their protectable business interests, a court must examine and balance the employer's legitimate business interest, the "individual's right to work, the public's right to unrestrained competition, and the right to contract…in determining whether to enforce a restrictive covenant." *Id.* Where a restrictive covenant meets the test of reasonableness, it is prima facie enforceable in equity. *John G. Bryant Co., Inc., v. Sling Testing and Repair, Inc.*, 471 Pa. 1, 6-7, 369 A.2d 1164, 1167 (1977). The employee who is trying to avoid a restrictive covenant bears the burden of proving that the restriction is unreasonable. *Id.* at 11-13, 1169-70; *Wellspan Health v. Bayliss*, 869 A.2d 990, 999 (Pa. Super. 2005).

1. The NSC is Incident to the Employment Relationship between Synthes and Harrison.

The NSC contained within the 2007 agreement was incident to Harrison's employment relationship with Synthes and a condition of his promotion to the position of sales consultant. (Synthes ex. 3; N.T. 90-91.) Both Harrison and Jacqueline Meister, the Director of Synthes Human Resources at the time, executed the 2007 agreement containing the NSC in connection with Harrison's promotion to the position of sales consultant. (Synthes ex. 3; N.T. 90-91.)

In the preamble to the 2007 agreement containing the NSC, Harrison acknowledged as much. In executing the 2007 agreement, Harrison agreed and affirmed that his promotion to sales consultant served as sufficient consideration for the 2007 agreement.[3] (Synthes ex. 3). He acknowledged:

In consideration of my promotion to sales consultant with Synthes Spine Co., L.P., and the other consideration as described in more detail below, the receipt and sufficiency of which I hereby acknowledge . . .

(*Id.*)

Finally, there has been no suggestion by Globus that the restrictive covenants at issue were not incident to Synthes and Harrison's employment relationship.

---

3. Although the acknowledgments of an employee in his employment contract does not relieve the court of its duty to make a finding whether an injunction should be issued, courts have held that such express agreements are a factor confirming the necessary elements for issuance of an injunction. *See Quaker Chem. Corp. v. Varga,* 509 F. Supp. 2d 469, 479 (granting preliminary injunction because employee expressly agreed that an actual or threatened breach of a restrictive covenant would result in irreparable harm for which monetary damages might be inadequate); *see also York Group, Inc. v. Yorktown Caskets, Inc.,* 924 A.2d 1234, 1243 (Pa. Super. 2007) (holding that agreement acknowledging irreparable harm flowing from breach confirmed existence of irreparable harm).

2. Synthes Has Legitimate Business Interests to Protect and The Restrictions Imposed by the NSC are Reasonably Necessary for that Protection.

Pennsylvania courts recognize that the trade secrets of an employer, customer goodwill and specialized training and skills acquired from the employer are all legitimate interests protectable through a general restrictive covenant. *Synthes USA Sales, LLC. v. Harrison*, 83 A.3d 242, 250 (quoting *Thermo-Guard, Inc. v. Cochran*, 596 A.2d 188, 193-94 (Pa. Super. 1991). The NSC contained within the 2007 agreement is necessary to protect Synthes's legitimate business interests, including the specialized training given to its employees, its trade secrets and confidential information, and its customer relationships and good will acquired through the efforts of its employees. *See Hess*, 570 Pa. at 163, 808 A.2d at 920.

a. Specialized Training

An employer's legitimate business interest in an employee's specialized training has been defined as the "efforts and money" invested by an employer to provide to its employees specialized training in the methods of the employer's business. *Pennsylvania Funds Corp. v. Vogel*, 399 Pa. 1, 6-8; 159 A.2d 472, 475-76 (1960)(upholding validity of restrictive covenant because employee's breach "caused and threatened to continue to cause irreparable damage to plaintiff's business…and negates the efforts and money invested in plaintiff's training program"). Synthes invested significant sums and efforts in providing extensive training to all sales consultants. This included basic training, fundamental training, and advanced training in various specialty areas. (N.T. 17, 89-90.) Evidence adduced at the hearings established that Synthes's sales consultants are very highly trained and

very important to Synthes. Their training is considered to be state-of-the-art and proprietary. (N.T. 89-90). A sales consultant's key responsibility is to have the requisite technical knowledge to be useful to the surgeon using Synthes's devices. The sales consultant is present in the operating room for that purpose. He or she also does the reordering and spends time with hospital staff to secure the all-important purchase orders. (N.T. 14-16.)

Mr. Harrison was aware of all of this. (N.T. 27.) Harrison recognized Synthes's legitimate business interest in its employee training, when he agreed that "Synthes invests substantial time, money, and effort on an ongoing basis, to train its employees with specialized skills and knowledge unique to Synthes and its business." (Synthes ex. 3.)

Harrison described of his knowledge of the spine industry before he joined Synthes as only a "basic understanding of spine anatomy and the procedures spine surgeons perform." (Synthes ex. 1.). He acknowledged in his Synthes employment application that sales consultants in the industry face a "steep learning curve." (*Id.*) Therefore, after only a year in the industry, upon joining Synthes, Harrison availed himself of Synthes specialized, extensive training. (Synthes ex. 4.) Harrison's employment with Globus directly infringes on this legitimate business interest.

b. Trade Secrets & Confidential Information

It is also recognized in this Commonwealth that an employer has a legitimate interest in the protection of its trade secrets and other confidential information. *See Hess*, 570 Pa. at 163, 808 A.2d at 921 (citing *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 631, 136 A.2d 838, 846 (1957)); *Volunteer Firemen's Ins. Servs., Inc.*

*v. CIGNA Property and Casualty Ins. Agency*, 693 A.2d 1330, 1337 (Pa. Super. 1997) (affirming non-compete covenant enforceable where independent insurance agency had legitimate protectable interests in confidential information and trade secret data); *see also Quaker Chem.*, 509 F. Supp. 2d at 479 (E.D. Pa. 2007) (holding employer entitled to specific performance of the non-competition covenant because former employee possessed extensive knowledge of employer's confidential information and thus had a "very real opportunity to harm Quaker's legitimate business interest" by working for a competitor); *Nat'l. Bus. Servs., Inc. v. Wright.* 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998) (holding defendant's proposed work for plaintiff's competitor "would violate the noncompete agreement" because, among other reasons, "[i]t is virtually inconceivable that [defendant] would be able to avoid utilizing the confidential information she learned at [plaintiff] corporation and exploiting [plaintiff's] customer goodwill).

Synthes supplies its sales consultants with significant information that it would not want a competitor to know, including the business plan for the entire year, the "playbook" (N.T. 19-21.) The business plan includes strategies and tactics for increasing business. The sales consultant has access to daily reports which break out relevant information by account, by region, by product segment and by surgeon preferences. (N.T. 20.) The sales consultants are told this information (the pricing information, master sheets, and associated codes) is not to be given to competitors.

One of the reasons such information is so highly guarded by Synthes is that it engages in what it calls "special pricing" with certain hospitals. These arrangements/

relationships are essentially "private deals," the existence of which Synthes does not want competitors such as Globus to know. (N.T. 25). Concomitantly, disclosure of even the existence of unique contracts would put Synthes in a bad light. (N.T. 27).

Harrison indisputably had access to and knowledge of proprietary and confidential information, which if disclosed to Globus, a direct competitor in every area of the industry dealing with the spine, would cause Synthes harm. (N.T. 21, 26, 28, 30-31.) He attended regional meetings two or three times a year where Synthes shared this confidential information with attendees. At such meetings, Synthes disclosed so-called "pipeline information," including the development of products, some of which would be considered revolutionary, as to which Synthes would not want Globus or anyone else to beat them to the market. (N.T. 30). These disclosures are considered trade secrets. (N.T. 31; N.T. 18-32; Synthes Ex. 12, 13.) Harrison was informed this was "to stay in-house." The word "confidential" was displayed on the classroom screen. (N.T. 28).

Harrison in his 2007 agreement acknowledged that "from the outset of and during [his] employment with Synthes, [he] ha[d] had and [would] continue to have access to, receive, learn, develop and/or conceive…information that is proprietary and/or confidential to Synthes;" that the information "must be kept in strict confidence to protect Synthes's business and maintain its competitive position in the marketplace," and that "[the] information would be useful to Synthes's existing and potential competitors for indefinite periods of time…." (Synthes ex. 3.) Harrison's continued employment with Globus places at risk Synthes's legitimate interest in its trade secrets and

confidential information through disclosure of Synthes's proprietary and confidential information.

c. Customer Relationships and Goodwill

Another business interest recognized under Pennsylvania law is an employer's interest in preserving the customer relationships established by employees on the employer's behalf. *John G. Bryant Co.*, 471 Pa. at 8, 369 A.2d at 1168. In *John G. Bryant Co.*, the Pennsylvania Supreme Court concluded that "[i]t is clear that the interest sought to be protected by the issuance of the preliminary injunction was that relationship which had been established on behalf [of the employer's] companies through the efforts of the former employee.... This is clearly an interest which is incapable of adequate protection by monetary damages and the use of equitable belief is needed to avoid the threatened harm." *Id.*

In *Bryant* the court emphasized that an employer's "'sole or major contact with buyers" is often through its employees, "and the success or failure of the firm depends in part on [the employees'] effectiveness...(t)he possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer....'" *Id.* (quoting *Sidco Paper Co. v. Aaron*, 351 A.2d 250, 253-54 (1976).

Pennsylvania also recognizes goodwill as a protectable interest for purposes of enforcing a restrictive covenant. *Hess*, 570 Pa. at 165-66, 808 A.2d at 922. In *Hess*, the Pennsylvania Supreme Court defined the interest protected under the umbrella of goodwill as a business's positive reputation. *Id.*; *see also Campbell v. Campbell*, 516 A.2d 363, 371 (Pa. Super. 1986) (defining goodwill as the

"advantage or benefit that inheres in a business beyond the mere value of the tangible assets of the business and which is attributable to the good reputation of the business on those qualities which cause existing customers to continue to patronize the business.")

Synthes and Globus are in a competitive industry that deals with highly skilled surgeons who are particular about the products they use, and necessarily, the companies that supply them. It is the uniqueness of each client/company relationship that mandates great effort and sustained contact with these surgeons and results in an extended time before a company's efforts come to fruition. Conversely, as Elliot Bloom, Synthes's territorial sale manager for Northern California, testified, client-surgeons can be "unforgiving" at times such that a breach in that relationship can have severe repercussions for a company.

At Synthes, the sales consultant develops relationships over a period of time with surgeons, even though it is actually the hospital that is the "customer." The sales consultant learns the surgeon's preferences. Two doctors in the same practice might perform the same surgery a very different way. (N.T. 31-32). Synthes will even custom-make devices for use by a particular surgeon. (N.T. 31). Such information takes a long time to gather and fine-tune. (N.T. 32). Bloom testified that sales consultants such as Harrison have "so much data . . . access to and all the knowledge . . . about surgeon preferences." (N.T. 42).

For example, Harrison, in his role as Synthes sales consultant, established, developed and maintained strong relationships over a period of time with individual surgeons such as Drs. French, Prasad, and Whitlatch, all of whom used Synthes products.

Harrison recognized Synthes's legitimate business interests in preserving these customer relationships and goodwill in his 2007 agreement. He agreed that "from the outset of and during [his] employment with Synthes, [he] ha[s] had and will continue to have access to and will be required to maintain, develop and initiate customer relationships and goodwill that are valuable to Synthes and which it has a legitimate interest in protecting. (Synthes ex. 3.) Now, however, defendants argue that because Harrison knew of or allegedly "developed relationships" with certain surgeons at issue before his employment with Synthes, it cannot claim a protectable business interest with respect to those surgeons.

First, Harrison explicitly agreed that he would have access to information and be required to maintain relationship with customers of Synthes in which Synthes had a legitimate business interest and thus would be subject to the NSC. *See, also, Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F.Supp.2d 491, 496 (E.D.Pa. 2000). Second, unlike the sales representative in *American Homecare Supply Mid-Atlantic, LLc a/b/a Young's Med. Equip. Co. v. Gannon*, 2009 Pa. Dist. & Cnty. Dec. LEXIS 246, at *32 (Pa. Com. Pl. 2009), Harrison's so-called customer "relationships" pre-Synthes and post-Synthes are materially different and so defendants' argument fails.

Harrison worked in medical sales for one year before joining Synthes and during that year, he worked for two different companies. In contrast, he worked at Synthes for seven years. Any "relationship" he had with surgeons during this limited time could not have been as sustained, repetitive and on-going as it was with Synthes. More important, Harrison's association with "Synthes," as a leader in this field, necessarily provided him with access

to and information about clients, products, and industry developments that he could not have had previously.

Harrison's own words used to describe his prior work history for his soon to be employer, Globus, supports this conclusion. In his employment application, Harrison described his job at Pacific Medical, Inc. as "managing and growing bone growth stimulator business used in spine surgery." (Synthes ex. 30.) He identified his responsibilities as "lead generation, getting prescriptions from surgeons, insurance authorization and fitting/in servicing patients with the device." When he described his experience at Synthes, he painted a quite different picture.

As to his tenure at Synthes, Harrison described a more sophisticated and complex employment. Instead of identifying "operational" type responsibilities (*i.e.* insurance authorization and prescription gathering) such as those he had at Pacific Medical/OsteoCare, Inc., Harrison's responsibilities at Synthes were to "seek out and capitalize on sales opportunities with spine surgeons and hospitals and position myself as an asset to all parties involved. Responsibilities include analysis, formulation and execution of a strategy. Once engaged it is critical to pay attention to every last detail to ensure that procedures go smoothly, surgeons and staff are happy and patients do well . . . ." (*Id.*)

Harrison was able to establish "his" client base and capitalize on such employment opportunities because of Synthes's efforts and investment in him and its business over the course of seven years, which included specialized training programs. Harrison acknowledged that these doctor relationships take years to develop and encourage as one learn's the preferences and skills of each particular doctor.. If that is the case, and the parties agree it is,

then any relationships Harrison has with surgeons at this point could not have been acquired through his earlier employment with Pacific Medical/OsetoCare, Inc.. These are Synthes's relationships, not his.

3. The NSC is reasonable in time and scope.

Restrictive covenants that are reasonably limited in duration and geographic extent may be enforced in equity. *Hess*, 570 Pa. at 157, 808 A.2d at 917; *Blair Design*, 530 A.2d at 1360. Pennsylvania courts have upheld restrictive covenants for terms of up to three years or more after employment ends. *See, e.g.*, *John G. Bryant*, 471 Pa. at 6, 369 A.2d at 1166 (three years); *Volunteer Firemen's Ins. Servs., Inc.*, 693 A.2d at 1338 (three years); *DeMuth v. Miller*, 652 A.2d 891, 900 (Pa. Super. 1995) (five years); *see also Nat'l. Bus. Servs., Inc.*, 2 F. Supp. 2d at 708; *see also Seligman & Latz of Pittsburgh, Inc. v. Vernillo*, 382 Pa. 161, 114 A.2d 672, 674 (enforcing one-year covenant); *Robert Clifton Assoc., Inc. v. O'Connor*, 487 A.2d 947, 952-53 (Pa. Super. 1985) (same);

The non-solicitation restriction imposed by the 2007 agreement is reasonable as to time because Harrison is solely prohibited from soliciting Synthes's customers or prospects for which he was responsible or had contact for a period of one year after termination of his employment. (Synthes ex. 3.) The NSC is also reasonable with respect to its geographic scope. The NSC restricts Harrison from soliciting, contacting, or providing services to a limited group of individuals within a specifically defined territory: customers or prospective customers of Synthes in and around northern and central California to whom Harrison provided services during his last two years of employment with Synthes. (Synthes ex. 3.) Harrison is still free to compete wherever he likes — provided that it is not with

his former customers. *See, e.g.*, *John G. Bryant Co.*, 471 Pa. at 7; 369 A.2d at 1169 (upholding non-competition provision pertaining to a specifically defined sales territory of Southern New Jersey, Eastern Pennsylvania, and the State of Delaware); *Vernillo*, 382 Pa. at 164-66, 114 A.2d at 674 (upholding restrictive covenant prohibiting providing services to employer's former customers, as number of customers would necessarily restrict the covered territory to a reasonable area); *Bell Fuel Corp. v. Cattolico*, 544 A.2d 450, 458-59 (Pa. Super. 1988)(finding restrictive covenant reasonable where covenant would solely cover geographic area where plaintiff's customers were located).

4. Synthes Is Likely To Succeed On Its Claims Against Harrison For Breach Of Contract And Globus For Its Tortious Interference With The NSC.

a. Breach of Contract

Upon resigning from Synthes on Friday, November 2, 2012, Harrison started working in the same capacity for Synthes's competitor, Globus. (N.T. 37; Harrison aff. ¶7.) Harrison's first official day of employment with Globus was November 5, 2012, the Monday immediately following his resignation from Synthes. (N.T. 38, 51.) It is undisputed that he began contacting Synthes's customers from his very first day on the job at Globus. Harrison continued this contact in violation of the NSC through November 2, 2013, and up to the date of the most recent hearing. Harrison admitted that he contacted, solicited, provided services to, and made Globus sales to Synthes customers in his territory. This contact was summarized for the court in Synthes ex. 42.

For example, a Synthes sales consultant witnessed Harrison in the purchasing manager's office at Sutter

General Hospital, a Synthes customer for which Harrison had responsibility. The sales consultant overheard Harrison say "Don't I need to give you any pricing on this?" He then witnessed Harrison's gesturing to a Globus product brochure and verbally compared that product to a competing Synthes product that was the first of its kind in the marketplace, and for which Synthes had a confidential pricing arrangement. (N.T. 72-77.)

Harrison also immediately reached out to his Synthes customers by email in an apparent effort to transfer business to Globus. On November 15, 2012, Harrison sent an email to Scarlet Rhoads a program coordinator at Enloe Medical Center titled "meeting opportunity." In the email, Harrison leveraged his knowledge from his prior employment with Synthes and wrote:

> I served Enloe well during my tenure with Synthes and would very much like to establish dialogue to see if we can get approved as one of your vendors. *With my knowledge of the previous contract and how Enloe operates I believe I can make this a very smooth process for you.*

(Synthes ex. 31) (emphasis added).) Harrison confirmed at the hearing that he was referring to Synthes's pricing contract with Enloe in the email. (*See also* Synthes exs. 32, 33.)

b. Tortious Interference

A claim for tortious interference with a contract requires: (1) the existence of a contractual, or prospective contractual relation between the complainant and a third party; (2) purposeful action on the part of the defendant, specifically intended to harm the existing relation, or to prevent a prospective relation from occurring; (3) the

absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct. In determining whether a particular course of conduct is improper...the court must look to...(1) the nature of the actor's conduct; (2) the actor's motive; (3) the interests of the other with which the actor's conduct interferes; (4) the interests sought to be advanced by the actor; (5) the proximity or remoteness of the actor's conduct to interference, and (6) the relationship between the parties. *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. 1997) (citing Restatement (Second) of Torts §767). A company may be liable for tortious interference with a contract if it hires away a competitor's sales employees for the purpose of converting business in disregard of the employees' post-employment obligations. *See Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211-12 (Pa. Super. 2003).

The NSC contained within the 2007 agreement was part of a contractual relationship between Synthes and Harrison. (Synthes ex. 3.) Globus is a direct competitor of Synthes in every area of the industry dealing with the spine. (N.T. 28.) Globus hired Harrison to provide services in the exact same capacity he had while employed by Synthes. Globus was certainly aware of the existence of the NSC. Synthes and Globus have a "history" in the courts already. (N.T. 94.) Globus has its own non-compete and used Synthes's non-compete agreement when it first established its business. (N.T. 89.) Further, Synthes sent Globus a letter soon after Harrison's departure that advised Globus of the NSC. (Synthes ex. 11.)

B. Synthes Will Suffer Immediate and Irreparable Harm If An Injunction Is Not Issued.

The threshold evidentiary requirement that must

be met before a preliminary injunction may be issued is proof of irreparable harm. *New Castle Orthopedic Assocs. v. Burns*, 481 Pa. 460, 467, 392 A.2d 1383, 1387 (1978). "An injury is ... irreparable if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard." *West Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295, 299 (Pa. Super. 1999). The disruption of "customer relationships" constitutes irreparable harm. *Id.*; *see also Santoro v. Morse*, 781 A.2d 1220, 1226 (Pa. Super. 2001); *Carlini v. Highmark*, 756 A.2d 1182, 1188 (Pa. Cmwlth. 2000), *appeal denied*, 565 Pa. 676 (2001); *Robert Clifton Assoc., Inc. v. O'Connor*, 487 A.2d 947, 950-52 (Pa. Super. 1985). The "unbridled threat of the continuation of the violation" of a contractual non-competition provision constitutes irreparable harm. *West Penn*, 737 A.2d at 299. In cases where the plaintiff's proof of injury, although small in monetary terms, foreshadows the disruption of established business relations which would result in incalculable damage should the competition continue in violation of the covenant, irreparable harm is shown. Irreparable harm is likely to result when an employee resigns to work for a competitor, carrying with him the employer's goodwill, customer relationships, and confidential information. Additionally, the "loss of potential customers" constitutes irreparable harm for purposes of issuance of a preliminary injunction. *Philip Morris, Inc., v. Pittsburgh Penguins, Inc.*, 589 F. Supp. 912, 913, 920 (W.D. Pa. 1983); *Masure v. Massa*, 692 A.2d 1119, 1121-22 (Pa. Super. 1997), *appeal denied*, 546 Pa. 695 (1996); *Sovereign Bank v. Harper*, 674 A.2d 1085, 1093 (Pa. Super. 1996); *see also John G. Bryant Co.*, 471 Pa. at 6-7; 369 A.2d at 1167 ("It is not the initial breach of a covenant which necessarily establishes the existence of irreparable harm but rather the threat of the

unbridled continuation of the violation and the resultant incalculable damage to the former employer's business that constitutes the justification for equitable intervention."); *Pennsylvania Funds Corp.*, 399 Pa. at 8, 159 A.2d at 476 ("The aforementioned activities of the defendant have caused and threaten to continue to cause, irreparable damage to plaintiff's business and impairs and destroys plaintiff's valuable goodwill, and negates the efforts and moneys invested in plaintiff's training program.")

Not unlike the employers in the cases cited above, Synthes invested significant resources in Harrison's specialized training in this industry, entrusted him with its confidential and proprietary information it did not want a competitor like Globus to know, and gave him continuous and extensive access to its business relationships to the point where he developed relationships with individual surgeons and learned the preferences of each. (N.T. 17-18, 21, 26-27, 30-31.) Synthes will be unable to place a monetary value on the loss of potential customers or the proprietary training provided to Harrison that he has since used and traded off of on behalf of Globus, Synthes's direct competitor. It will be extremely difficult to place a monetary value on resource investment and competitive advantage that were built up over years and lost — and continue to be lost — as a result of Harrison's conduct. (*See* N.T. 21-22, 26, 32, 41-42.)

Likewise, Synthes's goodwill and its current and future customer relationships have been, and will continue to be harmed, without an injunction. Both sides agree that the relationship a company in this industry has with its surgeons is unique and essential. Synthes's 2007 agreement sought to protect these customer relationships for a year after Harrison left Synthes. This restriction was to allow

Synthes a reasonable time, as a Globus representative conceded, "keep the business." (Synthes ex. 41.) This is because the harm and threat to Synthes's business occurred not just on day one following his change of employment, but continues at present. Each time Harrison solicits and contacts his former customers in violation of the NSC, he is eating away at and necessarily harming the goodwill and customer relationships forged under the effort and money of Synthes. Unless Harrison is enjoined, Synthes's business, goodwill and customer relationships and its ability to manage and promote distribution of its products will be harmed.

C. A Preliminary Injunction Will Restore the Status Quo.

A preliminary injunction is appropriate if "it properly restores the parties to their status as it existed immediately prior to the alleged wrongful conduct." *John G. Bryant, Co.*, 471 Pa. at 6-7, 369 A.2d at 1167. The status quo to be maintained by preliminary injunction is the last actual, peaceable and lawful uncontested status which preceded the pending controversy. *Valley Forge Historical Soc'y v. Washington Mem'l Chapel*, 493 Pa. 491, 501-02, 426 A.2d 1123, 1129 (1981).

The issuance of a preliminary injunction here will return the parties to the status quo that existed prior to Harrison's departure. Without a preliminary injunction, Harrison will continue to contact former Synthes customers on Globus's behalf. Based upon the knowledge he possesses, such contact will continue to harm Synthes's legitimate business interests. Granting injunctive relief simply requires Harrison and Globus to honor the terms of the NSC to which Harrison agreed was bound from the day he resigned.

**D. Preliminary Injunctive Relief is Proper Because the Balance of Hardships Weighs Heavily in Favor of Synthes and an Injunction is Reasonably Suited to Abate the Offending Activity.**

A preliminary injunction should be issued if "greater injury will result if preliminary injunctive relief is denied than if such relief is granted." *Anesthesiology Assocs., Inc. v. Allegheny General Hosp.*, 826 A.2d 886, 891 (Pa. Super. 2003), *appeal denied*, 844 A.2d 550 (2004). Typically, where the injunction sought against a former employee is limited to preventing the use or disclosure of confidential information, and prevents the employee from working in a defined territory and/or with specific customers in direct competition with his or her former employer, the balance of the hardships weighs in favor of the employer plaintiff. *See Fisher Bioservices v. Bilcare*, No. Civ. A. 06-567, 2006 U.S. Dist. LEXIS 34841, at *12 (E.D. Pa. May 31, 2006)(finding enforcement of agreement that precluded employee from using confidential information and soliciting business opportunities from customers limits harm suffered by employee and sufficient to protect employer's interests."); *see also Nat'l Bus. Servs.*, 2 F. Supp. 2d at 709 (finding balance of harms weighed in favor of employer because defendant would still be able to earn a livelihood.)

The harm that immediate injunctive relief would inflict upon Harrison is limited — as is his 2007 agreement. The injunction would prohibit Harrison from soliciting his former Synthes customers, including those with whom he came into contact during the last two years of his employment with Synthes. (Synthes ex. 5.) The preliminary injunction is reasonably suited to abate the offending activity and is tailored to do no more than that.

During the injunction period, Harrison would be free to continue working in the medical industry, as long as he does not solicit Synthes's customers while doing so. Harrison agreed to this obligation in the 2007 agreement, and was well aware of the repercussions of his breach.

E. Injunctive Relief is in the Public Interest

The public interest is best served by upholding the NSC into which Harrison freely entered. In this instance, granting immediate injunctive relief "will discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations." *Nat'l Bus. Servs. Inc.*, 2 F. Supp. 2d at 709; *see also Graphic Mgmt. Assocs., Inc.*, 1998 WL 159035, at *19 ("Enforcement of these policies is necessary to the maintenance of a free and open marketplace...[It] will also deter companies... from encouraging employees from breaching their noncompete agreements.") It is in the public interest to enforce legitimate restrictive covenants. *Merrill, Lynch, Pierce, Fenner, & Smith, Inc. v. Napolitano*, 85 F. Supp. 2d 491, 499 (E.D. Pa. 2000) (holding injunction would serve public interest by enforcing valid contractual provisions); *Minnesota Mining & Mfg. Co. v. Gessner*, 78 F. Supp. 2d 390, 393 (E.D. Pa. 1999) (enforcement of defendant's employee agreement promotes public good by protecting legitimate business interests").

Both Harrison and Globus were aware of Harrison's obligations under the NSC when Harrison assumed his role with Globus. (N.T. 94; Synthes ex. 11.) Yet, immediately upon his Globus employment, Harrison began soliciting his former Synthes customers in disregard of the NSC, a practice which he has since continued. (N.T. 36-39, 72-77). Harrison cannot completely disregard his obligations

under the 2007 agreement. To allow him to do so would encourage employees in general — and, in particular, in this competitive industry — to engage in unfair competition and use confidential information for improper purposes.

## II. SYNTHES IS ENTITLED TO A PRELIMINARY INJUNCTION UNTIL NOVEMBER, 2014 BECAUSE THE 2007 AGREEMENT PROVIDES FOR A ONE-YEAR EXTENSION OF THE INJUNCTIVE PERIOD FROM THE DATE OF THE LAST BREACH

The 2007 agreement by its terms provides for a one-year stay away period. Harrison agreed that for a period of 12 months after the end of his employment with Synthes, he would be prohibited from

> solicit[ing], contact[ing], or provid[ing] services to... (1) any customer of Synthes within [his] assigned territory; (2) any customer of Synthes that [he] contacted, solicited, received commissions on sales, to whom [he] provided coverage, or in any way supported or dealt with at any time during the last two years of [his] employment; (3) any prospective customer of Synthes that [he] contacted or who received or requested a proposal or offer from [him] on behalf of Synthes at any time during the last two years of [his] employment; (4) or any customer of Synthes for which [he] had any direct or indirect responsibility at any time during the last two years of my employment.

(Synthes ex. 003). Had Harrison honored the terms of the 2007 agreement, he would have been bound by the NSC from November 2, 2012 — the date of his resignation — through and including November 2, 2013.

The 2007 agreement also provided for the "extension" of the NSC should prohibited conduct occur during the

restrictive period. The 2007 agreement provides that

> [t]he limitations in this agreement which apply for a period of twelve (12) months after termination shall be enforced by a court from the date of the last breach or violation of the applicable restriction. Synthes-003.

Pennsylvania law supports the enforcement of such extension provisions. *See, e.g., Judge Tech. Servs., Inc. v. Clancy*, 813 A.2d 879, 882, 891-92 (Pa. Super. 2002) (affirming 18-month extension of restrictive covenants where agreement provided that "the restrictive covenant set forth herein shall be extended for a period of time equal to any period of time during which [employee] is in violation of its provisions."); *Worldwide Auditing Servs., Inc. v. Richter*, 587 A.2d 772 (Pa. Super. 1991) (approving provision that "called for an extension of time if [plaintiff] sought and was granted enforcement due to [employee's] violations, noting that employee "must now live with the bargain which he struck, just as he would have to live with any other unadvantageous term that was used against him in a contract"); *see also Maaco Franchising, Inc. v. Augustin*, 2010 WL 1644278, at *4 (E.D. Pa. Apr. 20, 2010) (noting that the prohibition against equitable extension of restrictive covenants set forth in *Hayes v. Altman* does not apply to contractual extensions, as "the Pennsylvania Supreme [*sic*] Court has found a provision extending the covenant not to compete if it were violated to be reasonable").

It is undisputed that Mr. Harrison's last day of employment with plaintiff was November 2, 2012. Therefore, the applicable restriction would have run through November 2, 2013. In measuring the date from which the "last breach" of that restriction occurred, the last possible date was November 2, 2013 (the 365th day

after Mr. Harrison's employment terminated). Harrison admitted that he has continuously been in contact with Synthes customers. The start date for measurement of the 12 month restriction because of his violation of the NSC, therefore, is November 2, 2013, and the 12 month restrictive period should run until no later than November 2, 2014.

Synthes's request that the court extend the restrictive period not from the date of the last breach or violation of the 2007 agreement as provided for in the contract, but for yet another year from the date this court issues a decision is not appropriate. Although the court recognizes that the appeal process delayed the present decision, such delay was neither intentional nor due to the fraudulent conduct of any party.

Synthes anticipated the possible need for an "extension" of the restrictive period and chose to extend its restrictions *only* from the date of the last breach or violation of the 2007 NSC agreement, which was in effect for one (1) year post-employment. If Synthes intended for its restrictions to apply even during a lengthy legal battle, it could, and should, have included language tolling the term of restriction during litigation. In fact, Harrison's earlier agreement in essence did just that. The 2005 NSC agreement contained the following "extension" provision:

> If I am found to have violated this agreement, the period of enforcement will run from the date the court enters final judgment or order enforcing the agreement.

The 2007 agreement did not extend the restrictions in the same manner and cannot be extended beyond the term agreed to by the parties.

## CONCLUSIONS OF LAW

1. The NSC contained within the 2007 agreement was incident to Harrison's employment relationship with Synthes.

2. The restrictions imposed by the NSC in the 2007 agreement are reasonable in time and scope.

3. The NSC contained within the 2007 agreement is necessary to protect Synthes's legitimate business interests, including the specialized training given to employees, the protection of its trade secrets and confidential information and its customer relationships and good will acquired through the efforts of its employees.

4. Harrison had access to and knowledge of proprietary and confidential information, which if disclosed to Globus, a direct competitor in every area of the industry dealing with the spine, would cause Synthes harm. (N.T. 21, 26, 28, 30-31.)

5. Harrison's continued employment with Globus places at risk Synthes's legitimate interest in its trade secrets and confidential information through the disclosure or threat of disclosure of Synthes's proprietary and confidential information.

6. Synthes has an interest in preserving the customer relationships established by its employees on its behalf. It also has a legitimate business interest in protecting its goodwill.

7. Harrison's knowledge about some key surgeons before his employment with Synthes does not negate the existence of Synthes's legitimate business interests with respect to those surgeons.

8. Harrison was able to establish his client base and "capitalize" on employment opportunities at Synthes

because of Synthes's efforts and investment in him and its business over the course of seven years.

9. Synthes is likely to succeed on its claims against Harrison for breach of contract and Globus for its tortious interference with the NSC.

10. Synthes will suffer immediate and irreparable harm if an injunction is not issued.

11. Synthes invested significant resources in Harrison's specialized training in this industry, entrusted him with its confidential and proprietary information that it did not want a competitor like Globus to know, and gave him continuous and extensive access to its business relationships to the point where he developed relationships with individual surgeons and learned the preferences of each.

12. Synthes will not be able to place a monetary value on the loss of proprietary training provided to Harrison that he has used and traded off of on behalf of Synthes's direct competitor, Globus.

13. Synthes will be irreparably harmed with respect to its business, its goodwill and relationships with its customers and necessarily its ability to manage and promote distribution of its products.

14. This harm and threat to Synthes's business occurred not just on day one following his change of employment, but continues at present.

15. A preliminary injunction will restore the status quo between the parties and requires Harrison and Globus to honor the terms of the NSC to which Harrison agreed.

16. The balance of hardships weighs heavily in favor of Synthes.

17. Injunctive relief is in the public interest. Failure to enforce the 2007 agreement would encourage employees in general — and, in particular, in this competitive industry — to engage in unfair competition and use confidential information for improper purposes.

18. The harm that immediate injunctive relief would inflict upon Harrison is limited as he is not prohibited from continuing to work in the medical industry. Harrison agreed to this obligation in the 2007 agreement.

19. The 2007 agreement provides for a one-year extension of the injunctive period from the date of the last breach should prohibited conduct occur during the restrictive period.

20. Had Harrison honored the terms of the agreement, he would have been bound by this non-solicitation covenant from November 2, 2012 — the date of his resignation — through and including November 2, 2013.

21. The last possible date of the restriction was November 2, 2013. The start date for measurement of the 12 month restriction given Harrison's violation is November 2, 2013, and the 12 month restrictive period should run until no later than November 2, 2014.

An appropriate order follows.

PRELIMINARY INJUNCTION

And now, this 19th day of May, 2014, upon consideration of plaintiff Synthes USA Sales, LLC's ("Synthes") petition for a preliminary injunction against defendants Peter Harrison ("Harrison") and Globus Medical, Inc. ("Globus") (collectively, "defendants"), the parties' legal submissions and supporting evidence and having held an evidentiary hearing on December 13, 2012 and May 1,

2014, it is ordered that defendants are enjoined as follows:

1. Harrison is hereby prohibited from soliciting, contacting, or providing services to, directly or indirectly, all of the accounts and doctors listed on exhibit "A" to this order, including any hospital employees who influence or may influence the use of medical devices, including materials management, operating room, sterile process, and related personnel, as well as the doctors' partners, employees and staff nurses through and including November 2, 2014;

2. Globus shall not, on its behalf, permit, allow, encourage, assign, or induce Harrison to perform any of the activities set forth in paragraph 1 through and including November 2, 2014;

3. For the duration of this preliminary injunction, Harrison must provide a copy of this preliminary injunction to any current and/or future employer, other than Globus, if that employer engages in the same or similar business as Synthes;

4. Defendants shall maintain and hold all records, documents and other forms of information, including that stored in electronic form in any place which defendants may store such information, which relate to the allegation in the verified complaint, including those which reflect the dates and times of Harrison's contacts with Synthes customers and prospective customers, and other information that must be preserved to ensure the fair conduct of this litigation;

5. This preliminary injunction shall become effective immediately as Synthes has already posted a bond to secure the payment of any costs and damages that may be incurred or suffered by any party who is found to have

been wrongfully enjoined or restrained;

6. This preliminary injunction shall remain in effect until further order of this court, or the date of November 2, 2014, whichever first occurs; and

7. The earlier order of the court granting a preliminary injunction in part to Synthes, dated December 21, 2012, remains in effect except as modified by this order.